Kenneth A. GEWERTZ, In his capacity as a member of the New Jersey General Assembly and Individually, Plaintiff,

v.

Christopher J. JACKMAN, In his capacity as Speaker of the New Jersey General Assembly and Individually, New Jersey General Assembly Democratic Caucus, Albert Burstein, in his capacity as Chairman of the New Jersey General Assembly Democratic Caucus and Individually, Defendants.

Civ. A. No. 79–565.

United States District Court,
D. New Jersey.

March 29, 1979.

Neil I. Sternstein, Woodbury, N. J., for plaintiff.

Lawrence I. Marinari, Stockman, Mancino, Marinari, Smithson & O'Donnell, P. C., Trenton, N. J., for defendants.

## OPINION

BROTMAN, District Judge.

This is one of the rare cases in which a federal court is asked to intervene in the affairs of a state legislative body. Plaintiff Kenneth A. Gewertz, a member of the New Jersey General Assembly, claims that his rights of free speech, due process, and equal protection, as guaranteed by the first and fourteenth amendments to the United States Constitution were violated when he was removed by the Speaker from the Assembly Appropriations Committee.

Plaintiff contends that his involuntary removal from this committee, an action upheld by a majority vote of the Assembly's Democratic Caucus, was in retaliation for his public criticism of a New Jersey state senator and of the governor, his outspoken disagreements with the Speaker and democratic party leadership, and his frequent failure to support their proposed legislation. Defendants are Christopher J. Jackman, individually and in his capacity as Speaker of the Assembly; the New Jersey General Assembly Democratic Caucus; and Albert Burstein, individually and in his capacity as Chairman of the Assembly Democratic Caucus. They deny any retaliatory motive for the removal, countering that plaintiff was removed to accommodate a representative from Essex County to replace a committee member from that county who had earlier resigned from the Assembly.

On February 16, 1979, plaintiff applied to this court for a preliminary injunction directing defendants to reinstate him as a member of the Appropriations Committee. He simultaneously filed a complaint seeking a permanent injunction and damages. The action is premised on 42 U.S.C. §§ 1983 and 1985(3). The court has jurisdiction pursuant to 28 U.S.C. § 1343(3).

On March 9, 13, 15, and 16, 1979, the court held hearings on the application for a preliminary injunction. There was testimo-

ny from plaintiff, from defendant Burstein, and from several of their fellow Assemblypersons, including Joseph W. Chinnici, Dean A. Gallo, Francis J. Gorman, Richard W. Van Wagner, Martin A. Herman, Alan J. Karcher, Mildred B. Garvin, and former Assemblyman Peter Shapiro. Pursuant to Fed.R.Civ.P. 52, the court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

Plaintiff is a democrat who represents the Fourth District in the New Jersey General Assembly, a district comprising parts of Gloucester, Camden and Burlington Counties. Plaintiff resides in Gloucester County, and has been a member of the Assembly since 1971. Tr. I—116.

He has a reputation for being outspoken, and has expressed frequent opposition to the leadership of his party, which is the majority party in the Assembly. He has also expressed opposition to the governor, who is a democrat as well. Tr. I—41–42, 80, 82, 111–12, 121; Tr. II—30; Tr. IV—10. For example, at a meeting of democratic representatives held at the Forsgate Country Club in November of 1978 to discuss the budget, plaintiff's vocal opposition to the governor's proposals and to the democratic leadership led to a loud disagreement with the Speaker, and plaintiff eventually left the meeting. Tr. I—74–76, 117–21; Tr. II—45–48. In early January of 1979, plaintiff filed charges with the Joint Ethical Standards Committee alleging a conflict of interest against State Senator Steven Perskie; hearings on those charges were held on January 25, 1979. Tr. I—131–32. News of the charges was reported in the press. Tr. IV—12.

Plaintiff's actions with respect to Senator Perskie caused distress to some members of the democratic leadership, including the Speaker and Majority Leader. Tr. I—131–32; Tr. IV—14. However, plaintiff is not the only outspoken Assemblyperson who has disagreed with or criticized Assembly leaders or the administration. Tr. I—50–52, 78, 82; Tr. II—24–25; Tr. III—18–20; Tr. IV—10, 25. Controversy between representatives is a regular and accepted part of the legislative process. Tr. I—42, 51, 78, 112–14; Tr. IV—11, 28.

It is uncontested that plaintiff was an able and diligent member of the Appropriations Committee, and it was so stipulated by defendants. Tr. I—17, 37, 68, 151; Tr. II—8, 82; Tr. IV—50.

At the beginning of each session of the Assembly, the Speaker appoints members to the various legislative committees, pursuant to General Assembly Rules 4:6[2] and 10:1. The latter rule, entitled "Standing Committees," describes the various committees, their respective subject areas and number of members, and further provides:

The Speaker shall appoint a chairman and vice-chairman for each standing reference, administrative and special committee. In the absence of the chairman, the vice-chairman shall preside at any meeting of the committee duly convened by the chairman. In case of the disability of a chairman, the vice-chairman shall, with the approval of the Speaker, assume all the responsibilities of the chairman. The chairman, vice-chairman, and all other members of each committee shall serve at the pleasure of the Speaker, but no committee member shall be removed from his committee assignment except for good cause.

---

1. At the outset, the court offered the parties the opportunity to consolidate the hearing on the application for preliminary injunction with the trial of the action on the merits, pursuant to Fed.R.Civ.P. 65. The parties declined to do so at the time, but requested consolidation after the conclusion of the proceedings. Because the court feels that the record is not as complete as possible, due primarily to the failure of defendant Jackman to testify, we decline to order consolidation and will decide only the preliminary injunction question at this point.

2. Section 4 of the Rules, entitled "Duties of the Speaker," provides at paragraph 4:6:

He shall appoint all committees in accordance with Rule 10:1, unless otherwise specially directed by the General Assembly. He may, during the inability of a committee member to serve, appoint another member of the General Assembly to serve during such period.

The final clause, relating to "good cause," first appeared in the 1977 Rules. Tr. I—157; Tr. IV—49.

The practice has been for each representative to submit to his party leader a list of three committee choices, and the majority and minority leaders amend the lists and in turn submit them to the Speaker. Tr. I—28, 36, 51. While the Speaker has generally acquiesced to the wishes of the party leaders, he has full discretion to make final committee appointments. Tr. I—15–16, 52, 54, 67; Tr. IV—69–72, 75. There are no fixed criteria by which the Speaker makes the selection, Tr. IV—72–74, 76–77, and this is generally considered a matter within his prerogative. Tr. I—34; Tr. IV—24.

There are four categories of committees, including Standing Reference Committees (of which the Appropriations Committee is one of fourteen), Standing Administrative Committees, Joint Committees, and one Standing Special Committee called the Legislative Oversight Committee (of which plaintiff is currently the chairman). Tr. IV—77–80.

Standing reference committees review and amend proposed legislation prior to its introduction for a vote of the full Assembly. Tr. I—21, 39–40, 44; Tr. IV—78. By contrast, the Legislative Oversight Committee does not review legislation prior to its passage, but investigates the execution of enacted laws. Tr. I—39–40, 74; Tr. IV—78. Assemblypersons derive a substantial benefit in representing their districts from membership on standing reference committees, since it gives them the direct opportunity personally to influence the details of legislation. Tr. I—20–21, 24, 29, 31, 44, 45, 47, 58, 72, 153–54; Tr. II—80. Thus, an Assemblyman would never be able to exert the degree of influence on the budget later before the full Assembly as he would now through membership on the Appropriations Committee. The major work on the 1979–1980 budget of that committee and of the Joint Appropriations Committee (which includes all members of the Assembly Appropriations Committee) covers the months January through May, 1979. Tr. I—19–20, 30–31. The stage during which members hold hearings with administration cabinet officials ended on March 15, and the committee is now holding public hearings. Tr. III—111.

Before plaintiff's removal from the Appropriations Committee, every Assemblyperson not in a leadership position was a member of at least one standing reference committee. Tr. I—26, 48, 146; Tr. IV—56. Plaintiff does not currently hold a leadership position. Tr. I—117.

In November 1978, Assemblyman Peter Shapiro, a democrat representing District 28, comprised of parts of Essex County, was elected county executive. Tr. III—87. Mr. Shapiro was then vice-chairman of the Appropriations Committee, as well as a member of the Taxation Committee. Tr. III—88. He resigned from the Assembly on January 8, 1979. Tr. III—88, 96.

Both prior to and after his resignation, Mr. Shapiro and Assemblyman Richard Codey, who heads the Essex County delegation, repeatedly pressured the Speaker to appoint another Essex County democrat to the Appropriations Committee in the place of Mr. Shapiro. Tr. III—90–105; Tr. II—63. There is one Republican member of that committee from Essex County, and her district comprises mainly suburban portions of that county. Tr. I—115; Tr. III—91; Tr. IV—37. The county is heavily democratic. Tr. III—92. In addition, there was concern among the democrats of the Essex County delegation that urban areas of the county were not adequately represented on the Appropriations Committee. Tr. III—95–104, 112; Tr. IV—16–17. Essex County has the largest delegation in the Assembly, and the Speaker was reminded that the delegation could refuse to cooperate with him should its concerns not be heeded. Tr. III—97, 104.

Nevertheless, the Speaker appointed as Mr. Shapiro's replacement Assemblyman Richard Van Wagner of District 12, which comprises parts of Monmouth and Middlesex Counties. Tr. I—93; Tr. III—96. The Speaker's rationale for appointing Mr. Van Wagner was the perceived need to have a

member of the Taxation Committee on the Appropriations Committee, a role Mr. Shapiro had filled. Tr. I—107; Tr. III—96; Tr. IV—15, 53. Assemblyman Van Wagner is chairman of the Taxation Committee, Tr. I—84; Tr. III—96, and had been a member of the Appropriations Committee in prior sessions. When he was not reappointed for the current term, he had requested that the Speaker consider him should a vacancy occur. Tr. I—83–84, 94; Tr. IV—15. In addition, the Speaker at one point stated to plaintiff that he was concerned because a staff person attached to both the Taxation and Joint Appropriations Committees had recently died. Tr. I—126.

In December 1978 and January 1979, there were rumors that plaintiff was to be removed from the Appropriations Committee. Tr. I—41, 99; Tr. II—57; Tr. IV—13. Plaintiff was made aware of the pressure being brought to bear by the Essex County delegation for democratic representation on the Appropriations Committee. Tr. II—63, 125. In addition, plaintiff testified that he had a series of conversations during that period, primarily with the Speaker but also with other members of the democratic leadership, during which he was threatened with removal from the Appropriations Committee because of his outspokenness. Plaintiff testified that the Speaker on a number of occasions told him he was being pressured by the administration to remove plaintiff. Tr. I—122, 124–25, 130, 132; Tr. II—49–50, 53–55, 75–76. Plaintiff also testified that when he confronted Majority Leader Burstein with the rumors concerning his removal, the Majority Leader stated that removal was, in effect, a sanction for the filing of ethics charges against Senator Perskie. Tr. I—131; Tr. II—56. However, Mr. Burstein specifically denied making such a statement, although he acknowledged discussing plaintiff's rumored removal with him. Tr. IV—14–15.

On February 13, 1979, the Speaker officially informed plaintiff of his removal from the Appropriations Committee at a meeting in the Speaker's office. He gave plaintiff a signed letter, dated January 25, 1979, stating that he was being replaced by Assemblywoman Mildred B. Garvin, but citing no reason for this action. Plaintiff's Exh. 1; Tr. I—133–34. Mrs. Garvin represents urban areas of Essex County and was the choice of that county's delegation to serve on the Appropriations Committee. Tr. III—102, 107, 109. Plaintiff demanded to bring the Speaker's action to the attention of the Democratic Caucus, and he was afforded this opportunity at the next regularly scheduled conference. Tr. I—135–38.

The Democratic Caucus is a body comprised of a majority of Assembly members. Tr. I—98. There was a discussion concerning whether the matter of plaintiff's removal could be taken to the Assembly floor, or whether it was an administrative decision solely within the discretion of the Speaker. Tr. I—136; Tr. II—35; Tr. III—28–33; Tr. IV—23–24. As a condition of the Caucus' entertaining a discussion and vote on the matter, plaintiff agreed not to bring it to the floor of the full Assembly. Furthermore, he was told that, should the Caucus uphold the Speaker, his only recourse would be to the courts. Tr. I—136, 138–39; Tr. II—14, 34.

The Speaker appeared and addressed the Caucus meeting, stating that his reason for removing plaintiff from the Appropriations Committee was to create a seat for an Essex County democrat, and announced the appointment of Assemblywoman Garvin. Tr. I—137; Tr. II—36–37; Tr. IV—35–36. He denied any retaliatory motive. Tr. I—90; Tr. II—41; Tr. IV—20–21. The Speaker further agreed to abide by the vote of the Caucus. Tr. II—34; Tr. IV—20, 22. Plaintiff took the opportunity both at the Caucus meeting and during the prior meetings with the democratic leadership to address them, state his position, and take issue with their asserted reasons for removing him. Tr. I—125–27, 135–36; Tr. II—33, 77–78; Tr. IV—18–20.

The vote of 33 of the 43 members of the Democratic Caucus present to uphold the Speaker constituted a majority of the Cau-

cus. Tr. I—138; Tr. IV—23.[3] This was the first forced removal of an Assemblyperson from a committee to which he had been appointed in at least the last eight years, Tr. II—12, 26, 77, and consequently the scope of the Speaker's removal power under the "good cause" clause of Assembly Rule 10:1 has never before been tested. Tr. I—50; Tr. II—12; Tr. IV—20.

Both before and after plaintiff's removal, the Speaker mentioned that one of his reasons for choosing plaintiff as opposed to anyone else on the Appropriations Committee was that plaintiff was overworked, since he was also the Chairman of the Legislative Oversight Committee. Tr. I—125, 141; Tr. II—77-78. There was also testimony that this was stated by the Speaker at the Democratic Caucus meeting as a reason for his action. Tr. I—90, 98. However, we find that this was not the reason, since other members of the Appropriations Committee serve on the Oversight Committee, Tr. I—141; Tr. IV—61, and other members of the Appropriations Committee, including Mrs. Garvin, serve on more than one other committee. Tr. I—143, 148; Plaintiff's Exh. 2. In addition, the rules governing the Legislative Oversight Committee had recently been changed so that plaintiff could not undertake investigations without the Speaker's approval. This limited the work of that committee. Tr. I—40-41, 42, 61, 74-75, 145, 148-49; Tr. II—77-78.

■ Nevertheless, based on the record before us at this preliminary stage of the proceedings, we cannot say that plaintiff was removed because of his public statements or actions evincing opposition to the democratic leadership and the administration. Rather, we find that plaintiff was removed to create a place on the Appropriations Committee for an Essex County democrat, since there was no other such representative on the committee. Plaintiff was selected because Assemblyman Francis Gorman who represents the same district as plaintiff, Tr. I—66, is chairman of the committee. Tr. I—67; Tr. III—14-15; Tr. IV—34.

The Speaker had a genuine reason to appoint a democrat from Essex County. Although the testimony shows that geographic balance on committees is not a primary consideration in apportioning membership, and the committees are not in fact perfectly balanced geographically, a special situation had developed on the Appropriations Committee. With Mr. Shapiro's departure, there was considerable pressure from the democratic members of Essex County to have representation on that committee, and it was generally perceived by leadership that there was a legitimate need for such representation. Tr. IV—16-17, 49-50.

Furthermore, the Speaker had a bona fide reason for appointing a member of the Taxation Committee to replace Mr. Shapiro, who had previously provided a link between the two committees. This criterion for a new committee member is an eminently reasonable one, and there was no member of the Taxation Committee from Essex County, republican or democrat. Plaintiff's Exh. 2.

Finally, although we recognize that plaintiff had not ingratiated himself with the Speaker or the democratic leadership by his public statements and conduct, and that his outspokenness may have been considered by the Speaker, we find that the Speaker chose plaintiff for removal because he believed that plaintiff's district was adequately represented on the Appropriations Committee by Mr. Gorman. We consider this a plausible explanation, since as chairman of the committee, Mr. Gorman could reasonably be considered powerful enough alone to protect the interests of his district's constituents, or at least more capable of doing so than a mere committee member. While Mr. Gorman resides in a different county than

---

3. We find that any subsequent attempt by plaintiff to obtain redress before the full Assembly would have been futile because he would not have been allowed to bring the matter before that body. Tr. I—138-39; Tr. II—34, 84; Tr. II—33; Tr. IV—23.

plaintiff, Tr. I—66, Mr. Gorman testified that he endeavors to act for the benefit of all the district's constituents, Tr. I—71, and we find that it would not be unreasonable for the Speaker to so assume.

We further preliminarily find that, based on all the circumstances outlined above, plaintiff would have been removed from the Appropriations Committee regardless of his outspokenness and frequent opposition to the leadership of his party and the administration.

## CONCLUSIONS OF LAW

To decide if the preliminary injunction will be granted, we must determine that plaintiff has made four necessary showings: (1) that he has a reasonable probability of eventual success on the merits; (2) that he will suffer irreparable injury *pendente lite* if relief is not granted to maintain the *status quo ante*; (3) that the balance of the parties' hardships, if relief is granted, weighs in favor of plaintiff; and (4) that the public interest will be served by granting injunctive relief. *A. O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3rd Cir. 1976). Having heard the testimony of various members of the Assembly, including Mr. Burstein who is the Majority Leader and Chairman of the Democratic Caucus, we conclude that plaintiff has failed to meet criterion number one, probability of ultimate success on the merits.

First, in response to plaintiff's claim that his removal was in retaliation for the exercise of his first amendment rights, our preliminary factual finding that reasons unrelated to plaintiff's first amendment activity motivated the removal compels resolution of the issue against plaintiff at this point. Second, with regard to plaintiff's claim that his right to procedural due process under the fourteenth amendment was infringed, we find that, while plaintiff demonstrated a right or entitlement by virtue of the "good cause" for removal clause in Assembly Rule 10:1, he was afforded sufficient process. Third, we conclude that though plaintiff is the only Assemblyperson not on any stand-

ing reference committee, there has been no equal protection violation, because a rational basis exists for the present committee allocation. Finally, plaintiff lacks standing to raise the equal protection rights of his constituents.

### Preliminary Matters

■ Without directly attacking this court's jurisdiction or the justiciability of this action, defendants assert it is improper for this court to become involved in the operations of a state legislative body or to conduct an inquiry into the motivations of its leaders. While the court recognizes the delicacy of the task, we are convinced that the law requires us to do so when an individual legislator alleges that his constitutional rights have been violated by the legislature or its leaders.

■ There is clearly jurisdiction over the subject matter, since the cause of action "arises under" the federal constitution, *Powell v. McCormack*, 395 U.S. 486, 512–13, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), and comes within the language of 28 U.S.C. § 1343(3). *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *Davids v. Akers*, 549 F.2d 120 (9th Cir. 1977); *Kucinich v. Forbes*, 432 F.Supp. 1101 (N.D.Ohio 1977); *Ammond v. McGahn*, 390 F.Supp. 655 (D.N.J.1975), *rev'd on other grounds*, 532 F.2d 325 (3rd Cir. 1976). There is no bar to this court's review based upon the political question or the separation-of-powers doctrines. Those limitations on federal judicial review apply only where the court is faced with a challenge to action by a coordinate branch of the federal government. *Elrod v. Burns*, 427 U.S. 347, 351–52, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), citing *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Powell v. McCormack, supra*, 395 U.S. at 518, 89 S.Ct. 1944. The case at bar involves a question of constitutional interpretation, an area peculiarly within the province of the federal courts, with regard to the actions of state legisla-

tors. *See also Davids v. Akers, supra* at 126; *Kucinich v. Forbes, supra* at 1108–09.[4]

■ Defendants further raise the question of immunity, on the basis of both the federal and New Jersey constitutional speech and debate clauses, as well as under common law. It is clear that the speech and debate clause immunity in Art. I, § 6, of the federal constitution has no application to the members of state legislatures. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, —— U.S. ——, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); *In re Grand Jury Proceedings (Cianfrani)*, 563 F.2d 577, 580–81 (3rd Cir. 1977). Furthermore, Art. IV, § 4, ¶ 9, of the New Jersey Constitution, which tracks the federal speech and debate clause, cannot immunize a state legislator from liability for violation of federal constitutional rights made actionable by 42 U.S.C. § 1983. The Supremacy Clause, Art. VI of the United States Constitution, clearly mandates this conclusion. *See In re Grand Jury Proceedings, supra* at 582; *Bond v. Floyd*, 251 F.Supp. 333, 340 (N.D.Ga., three-judge court), *rev'd on other grounds*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966).

■ Finally, we must reject the suggestion that *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), confers on defendants a common law immunity against an injunction. That case preserves state legislators' common law immunity only against liability for money damages based on their official or legislative acts. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, supra*, —— U.S. at ——, 99 S.Ct. 1171; *In re Grand Jury Proceedings, supra* at 587 (Gibbons, J., concurring); *Kucinich v. Forbes, supra* at 1108 n.8. In *Bond v. Floyd, supra*, the Supreme Court reached the merits of a state legislator's claim of first and fourteenth amendment

deprivation at the hands of his fellow legislators without even discussing legislative immunity. Since all acts here were well within the legislative process and functions, defendants enjoy an immunity against damage claims in this suit; but there is no immunity from the equitable relief sought in the instant application for a preliminary injunction.

■ There is one other type of immunity which defendants do not raise, but which we feel compelled to mention. The Third Circuit Court of Appeals, in *In re Grand Jury Proceedings, supra*, recognized a personal privilege which may be asserted by a state legislator to shield evidence of legislative acts from serving as a basis for criminal liability. This privilege of nonevidentiary use arising under Federal Rule of Evidence 501 applies in both criminal and civil proceedings, as the court of appeals expressly noted. However, the rule does not restrict our inquiry at this stage, since no witness has raised this personal privilege at the hearings on this application.

Having determined that it is within our judicial power to grant a preliminary injunction against plaintiff's removal from his committee position if he establishes that his constitutional rights have been infringed, we turn to the merits, treating each constitutional claim seriatim.

*First Amendment*

Plaintiff contends that he was removed from his position on the Appropriations Committee as a sanction for having exercised his first amendment right to speak out on issues, to take positions in opposition to the leadership of his party and the administration, and to criticize publicly another legislator.

---

**4.** While defendants have not raised the issue, we note that there is "state action" as required by the fourteenth amendment and 42 U.S.C. § 1983. The Speaker's position is provided for in the New Jersey Constitution, and his powers of committee appointment and removal are set out in the General Assembly Rules passed by the Assembly, as we have explained above in the findings of fact. Furthermore it was held that actions of defendant Democratic Caucus constitute "state action" in *Ammond v. McGahn, supra*, and the Third Circuit expressly affirmed the district court on this point, although it reversed the result reached by the lower court. 532 F.2d 325, 327 n.3.

Where elected officials have been excluded or suspended from legislative bodies for the exercise of their right of free speech, the federal courts have not hesitated to enjoin such conduct as violative of the first amendment. In *Bond v. Floyd, supra,* the United States Supreme Court enjoined the Georgia House from excluding Julian Bond, a duly elected representative, on the ground that his public statements in opposition to the war in Vietnam barred him from taking the oath of office. The Court found this violated Bond's right of free expression under the first amendment.

Similarly, in *Kucinich v. Forbes, supra,* the district court issued an injunction against a two-week suspension of Councilman Gary Kucinich by a vote of the Cleveland City Council. Kucinich was disciplined pursuant to a council rule of order, on the charge that he had slandered the council president in a statement on the floor of that body. The court found that Kucinich had been punished for the exercise of his right to free speech and not merely for parliamentary failure to yield the floor, and in reliance on *Bond, inter alia,* determined that this constituted a first amendment violation.

A final example comes from our own district. In *Ammond v. McGahn, supra,* Judge Mitchell H. Cohen issued an injunction against the exclusion of New Jersey State Senator Alene Ammond from the Democratic Caucus, in part because the exclusion was based on her exercise of the right of expression. While the Third Circuit Court of Appeals reversed the result, reasoning that the controversy had been mooted when the Democratic Caucus reinstated Senator Ammond, this holding does not disturb the basic constitutional principle that a legislator cannot be punished for the exercise of his first amendment rights.

Defendants contend that the three cited cases are fundamentally distinguishable from the instant one, because each legislator was completely barred from the legislative body in question. In this case, they argue, plaintiff is excluded only from membership on a standing reference committee and retains his right to represent fully his constituents in the full Assembly as well as through the access that any assemblyperson enjoys to committees of which he is not a member. In closing argument, counsel for defendants contended that unless there is a "clear showing of exclusion" from the legislative process, the court should not act. To the extent that defendants mean that a federal court should not entertain a suit in which a legislator raises the issue of his first amendment rights where the asserted deprivation is less than full exclusion, we do not agree.

The very same argument might have been made against Senator Ammond, since she was excluded only from the Democratic Caucus, and not from the full Assembly. Such line-drawing may also have been applied in *Kucinich* on the ground that the plaintiff was only suspended for a two-week period and not expelled. Distinctions on the basis of the type of sanction, once it has reached beyond the *de minimis* level, are not appropriate when first amendment rights are raised. The threat of removal from a powerful committee position can be every bit as chilling to the exercise of free speech as total exclusion from the Assembly.

The argument advanced by defendants that the nature of the sanction determines whether there is any constitutional right at all resurrects the discredited "right-privilege" distinction. *See Elrod v. Burns, supra,* 427 U.S. at 360–61, 96 S.Ct. 2673. Furthermore, we perceive nothing in the holdings or language of *Bond, Kucinich* and *Ammond* to support defendants' contention that the first amendment principle applied there is limited to the particular facts of those cases. The type of deprivation, whether it be denial of an aisle seat, a telephone or non-appointment to a committee at the beginning of a legislative session, does not dictate whether the court may make a constitutional inquiry. Rather, the defendant's action is weighed when the court, in making the proper legal analysis, balances the importance of the governmental interest against the burden on the indi-

vidual's rights. *E. g., Elrod v. Burns, supra* at 362, 96 S.Ct. 2673; *Kucinich, supra* at 1111, 1115. Recognizing the political realities of the legislative process, it may well be that a court will be more deferential to the interest advanced by defendant legislators than to those of other defendants in applying the balancing test. *See Village of Arlington Hts. v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 268 n.18, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); L. Tribe, *American Constitutional Law* 592–93 (1978).

Defendants point to *Davids v. Akers, supra,* as support for their argument that total exclusion of a legislator from any meaningful participation in the legislative process is a prerequisite to judicial scrutiny of the legislator's first amendment claims. The *Davids* Court affirmed dismissal on the merits of a complaint by minority party members of the Arizona House of Representatives, finding no first amendment violation in the system of committee appointment because each of the plaintiffs retained "the usual right of a member to speak and to vote upon matters that come before the House. . . ." 549 F.2d at 124. Stating that resort to the judicial process was an inappropriate manner of challenging a state legislature's internal practices, the court was plainly troubled by the breadth of the remedy plaintiffs sought.

 The case at bar presents a completely different type of claim. Here an individual legislator was allegedly singled out and removed from an important committee at mid-session, contrary to past practice, because he exercised his first amendment rights. The relief he seeks, reinstatement on the committee, is far less disruptive of legislative procedure than the remedy sought in *Davids*, and is analogous to that granted in *Bond, Kucinich,* and *Ammond.* The safeguarding of individual citizens' constitutional rights is well within the proper function of a federal court.

These principles are underlined by the many public employee cases decided by the Supreme Court. The Court has repeatedly held that, while individuals may have no right in the first instance to their jobs, public employees may not be discharged solely for the exercise of their constitutionally guaranteed rights of free speech and association, absent a compelling state interest. *See, e. g., Givhan v. Western Line Consol. School Dist.,* —— U.S. ——, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Elrod v. Burns, supra; Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). We cannot, consistent with our duty to protect first amendment rights, distinguish between removal from a legislative committee and a loss of a public job where both are sanctions for the exercise of first amendment rights. *Bond* squarely holds that legislators enjoy the same degree of first amendment protection as private citizens. 385 U.S. at 136, 87 S.Ct. 339.

 *Elrod v. Burns* is particularly apposite. There, the Supreme Court struck down patronage dismissals as a violation of the employees' first amendment associational rights, notwithstanding the fact that the employees had acquired their jobs through the patronage system. Their positions were specifically categorized as patronage jobs, as opposed to other positions which were protected under the civil service. We think this supports our determination that removal of an elected official from a legislative committee on which, based on past practice, he legitimately expects to serve at least for the duration of the legislative session is a sanction which triggers constitutional scrutiny.[5]

---

**5.** There has been considerable disagreement between the parties on the significance for first amendment purposes of the "good cause" standard for removal of assemblypersons, which is set out in Assembly Rule 10:1 and quoted above in our findings of fact. Plaintiff argues that the presence of the clause in the rules distinguishes this case from one where the claim was that the Speaker failed to appoint a representative to a committee as a sanction for

In the area of political expression, the first amendment affords the broadest protection. *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See also Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 66–67, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). Free and uninhibited debate on matters of public importance has been termed by the Supreme Court, "the core value of the Free Speech Clause of the First Amendment." *Pickering v. Board of Education, supra,* 391 U.S. at 573, 88 S.Ct. at 1737. In *Bond,* the Supreme Court used the strongest language to describe the importance of the first amendment in protecting a legislator's right to speak out:

"The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy. The central commitment of the First Amendment, as summarized in the opinion of the Court in *New York Times v. Sullivan,* [cit. omitted] is that 'debate on public issues should be uninhibited, robust, and wide-open.' We think the rationale of the *New York Times* case disposes of the claim that Bond's statements fell outside the range of constitutional protection. Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected. . . . The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legisla-

tors. Legislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they may be represented in governmental debates by the person they have elected to represent them."

385 U.S. at 135–37, 87 S.Ct. at 349–350.

In *Bond* and in *Ammond,* there was no factual controversy regarding the reasons for defendants' actions. The defendants offered no reason for excluding the plaintiff, other than a constitutionally impermissible one. Similarly, in *Kucinich,* though there was some question as to whether the plaintiff had been suspended only for failure to yield the floor and not for the content of his speech, the court's factual inquiry was a limited one, concerning only a few minutes' of debate in the Council. By contrast, this court is faced with a more complicated set of circumstances, requiring a relatively broad inquiry into events over several months' time surrounding plaintiff's removal from the Assembly Appropriations Committee. While the instant case is thus somewhat different from the three cited ones, the basic principle is the same; this court will not be deterred from its paramount duty to safeguard the rights of an individual should we find that the facts dictate a finding of constitutional deprivation.

With these principles as our guideposts, we proceed to analyze the instant case. We have found as a fact, based on the record as it stands at this preliminary stage of the proceedings, that plaintiff was removed for a legitimate political reason, *viz.,* the resig-

---

the former's exercise of his first amendment rights. In view of cases such as *Perry v. Sindermann, supra* and *Mt. Healthy City School Dist. v. Doyle, supra,* we cannot agree. Those cases hold that a public employee may establish a claim to reinstatement if the exercise of his first amendment rights was the reason for his discharge or his not being rehired, *notwithstanding* his lack of tenure or other indicia of entitlement to the job. While the "good cause" provision is relevant to due process rights, *see infra,* it adds nothing to any first amendment claim.

Plaintiff also suggests that the "good cause" standard is void for vagueness. However, we reject the argument because the phrase does not on its face reach protected first amendment conduct, as did the challenged provision in *Kucinich, supra* at 1114–15 and *Coates v. Cincinnati,* 402 U.S. 611, 616, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), which plaintiff cited at closing argument. Neither is the phrase so vague to a legislator as to violate due process of law.

nation of Assemblyman Peter Shapiro created a need both for a democrat from Essex County and for a member of the Taxation Committee to be represented on the Appropriations Committee. Since no one assemblyperson could fill this need, a member of the Committee had to be displaced, and plaintiff was chosen because the Chairman of the Appropriations Committee represents plaintiff's district.

█ We recognize that it is peculiarly within the province of the Speaker to weigh the needs of the legislature as a whole and structure the committees accordingly. In the face of circumstantial evidence which strongly supports the defendants' asserted reason for removal of plaintiff, we are unwilling to overrule the Speaker in the performance of his legislative function, notwithstanding evidence that plaintiff's protected activity had annoyed the Speaker and other members of leadership. We note in this regard that as a general principle courts avoid as far as possible inquiries into legislative or executive motivation, recognizing the substantial intrusion into the workings of other branches of government. See Village of Arlington Hts. v. Metropolitan Housing Dev. Corp., supra, 429 U.S. at 268 n.18, 97 S.Ct. 555.

Having made the factual determination that the record does not support plaintiff's claims that he was removed from the Appropriations Committee for the exercise of his first amendment rights, there is no need to balance interests in order to reach a conclusion that there is no reasonable probability of ultimate success on the merits.

█ Furthermore, even if plaintiff's exercise of protected activity, in addition to the factors mentioned above, was considered by the Speaker in his decision to remove plaintiff, a right to reinstatement would not necessarily be established. In Mt. Healthy City School Dist. v. Doyle, supra, the Supreme Court held that even where protected first amendment conduct is a substantial or motivating factor for the action taken against a plaintiff, relief will not be afforded where defendants can prove by a preponderance of the evidence that they would have taken the same action even in the absence of the protected conduct. Based on the evidence in the record at this stage, we think that defendants in the instant case may be able to avail themselves of the Mt. Healthy doctrine. That is, even if plaintiff proves that his protected conduct influenced the Speaker, defendants will have the opportunity to show that this was not the "but for" cause of his removal from the committee. See Givhan v. Western Line Consol. School Dist., supra, 99 S.Ct. at 697.

## Equal Protection

█ Plaintiff also contends that his removal from the Appropriations Committee denied him equal protection of the laws guaranteed by the fourteenth amendment. In analyzing this claim, we conclude that only a rational relation test is required. Plaintiff does not assert discrimination by virtue of membership in a suspect classification. Nor is a seat on a standing reference committee of the Assembly a fundamental right. See Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam). The court finds that the Speaker's reasons for removing plaintiff, as outlined above, are rationally related to a legitimate purpose. Accordingly, we hold that, based on the record made up to this point, there is no reasonable probability that plaintiff will prove a violation of his right to equal protection.

█ We need not reach the issue of the equal protection rights of plaintiff's constituents, Ammond, supra, 390 F.Supp. at 660, since none is a plaintiff in this action. See Kucinich, supra at 1116–17. Plaintiff himself has no standing to assert their rights. See Singleton v. Wulff, 428 U.S. 106, 112–14, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

*Procedural Due Process*

██ Finally, plaintiff maintains that he was not provided procedural due process required by the fourteenth amendment. We have previously noted that the Assembly's customs indicate that legislators are not ordinarily removed from a committee in mid-session. Moreover, an Assembly rule specifically states that a member may only be removed during the session "for good cause." We hold that these customs and the rule create a legitimate expectation of retaining a committee position for the legislative session, and that a member cannot be deprived of that property interest during the session without due process of law. *See Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Perry v. Sindermann, supra,* 408 U.S. at 602, 92 S.Ct. 2694; *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). *See also Kucinich, supra* at 1115 n.21.

██ We further hold that the process due in this instance included notice, some manner of hearing before the ultimate decisionmaker, the Speaker, and a statement of the reasons for the action. *See Memphis Light, supra* 436 U.S. at 12–19, 98 S.Ct. 1554; *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Town Court Nursing Center, Inc. v. Beal,* 586 F.2d 266 (3rd Cir. 1978); *Klein v. Califano,* 586 F.2d 250 (3rd Cir. 1978). Given the wide latitude to determine committee membership provided the Speaker by the Assembly Rules, and the court's great reluctance to impose procedural restraints on a legislative body, we hold that the hearing need not be formal or prior to removal. *See Goss, supra; Town Court, supra; Klein v. Califano, supra.*

██ The court finds that the plaintiff was afforded all the process due him. He was told by the Speaker several times prior to his removal of the pressure on the Speaker to place an Essex County representative on the Appropriations Committee. He was given formal notice of his removal by the Speaker on February 13, at which time he received a notice letter. During that meeting, and at the subsequent meeting of the Democratic Caucus, plaintiff was apprised by the Speaker of the previously described reasons for his removal. Plaintiff was afforded an opportunity to present his views to the Speaker in his office when he was informed of his removal, as well as at the Caucus meeting. He had also had discussions with the Speaker and the Democratic leadership previously. Thus the present record indicates that plaintiff received the requisite due process, and does not demonstrate that plaintiff has a reasonable probability of prevailing on this legal ground.[6]

Accordingly, the application for preliminary injunction is denied. We reiterate that our factual and legal determinations are preliminary ones, reflecting only a decision on the question of extraordinary equitable relief. A more complete record, including the deposition or courtroom testimony of the Speaker, may lead us to a different result. Accordingly, the court

**6.** There has been much discussion during the hearings about the meaning of "good cause" as that phrase is used in Assembly rule 10:1. One view advanced by several of the legislator-witnesses is that good cause includes only an assemblyperson's performance of his committee duties. *See* Testimony of Assemblyman Herman, Tr. II—4-8; Testimony of plaintiff, Tr. I—151, 156. Another view expressed by other legislators is that good cause can encompass any genuine concern relating to the functioning of the Assembly, and merely proscribes removal for purely whimsical reasons, such as "the way a man parts his hair," as explained by Assemblyman Karcher, Tr. III—10-12. *See also* Testimony of Assemblyman Chinnici, Tr.

I—33; Testimony of Assemblyman Burstein, Tr. IV—50, 52.

We decline to resolve this issue. It is unclear from the complaint and from the oral argument whether plaintiff raises the issue as part of his due process claim, or as a pendent state claim. If the former, we believe that the "good cause" provision is relevant only to create an entitlement or property interest as a prerequisite to reaching the issue of what process is due. If the latter, we decline to exercise our discretionary pendent jurisdiction, *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), because we believe this task is more properly reserved to the Assembly itself in establishing its own rules of operation.

will pursue the matter on an expedited basis, and in our order denying the preliminary injunction we will set a date for a pretrial conference and the completion of all discovery.

## ORDER

This matter having been opened to the court by plaintiff Kenneth A. Gewertz upon application for a preliminary injunction; and

The court having heard testimony and considered the arguments and briefs of counsel; and

For the reasons stated in this court's opinion filed this day,

It is on this 29th day of March, 1979, hereby ORDERED that the application for preliminary injunction is denied.

It is FURTHER ORDERED that a pretrial conference will be held before this court on April 17, 1979 at 9:30 A.M., and all discovery shall be completed by April 30, 1979.