**Stephen and Penny WETTER, et al., Plaintiffs,**

v.

**CAESARS WORLD, INC., Nominal Defendant,**

**Clifford S. Perlman, Stuart Z. Perlman, J. Terrence Lanni, Jay E. Leshaw, Harold D. Berkowitz, M. Peter Schweitzer, Manuel Yellen, James J. Needham, Peter Escheverria, William H. McElnea, Jr., Defendants.**

Civ. A. No. 81–3442.

United States District Court,
D. New Jersey.

Jan. 5, 1982.

Richard D. Greenfield, Greenfield & Chimicles, P.C., Bala Cynwys, Pa., for ABC Bridge Club.

Bernard M. Gross, Gross & Sklar, P.C., Philadelphia, Pa., for Arnold Litten.

Daniel W. Krasner, Wolf Haldenstein, Adler, Freeman & Herz, New York City, for Ira Ellenthal.

Steven M. Kramer, Philadelphia, Pa., for Frances Cherkin.

Jules Brody, Stull, Stull & Brody, New York City, for Harry Lewis.

Arnold Levin, Levin & Fishbein, Philadelphia, Pa., for Lily and Sheldon Pearl.

Roger W. Kirby, Kaufman, Taylor & Kimmel, New York City, for Barnett Stepak.

Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, Pa., for Jacob and Isabel Heffler.

Stuart H. Savett, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., for George R. Goldstone.

Edward A. Grossmann, Kreindler & Kreindler, New York City, for Admin. Sales Associates Profit Sharing Plan.

Lawrence Sucharow, Kass, Goodkind, Wechsler & Labaton, New York City, for Stephen and Penny Wetter.

Arthur N. Abbey, Law Offices of Arthur N. Abbey, New York City, for Ann Pieri and Edward Guerrero.

Mordecai Rosenfeld, New York City, for Ann C. Sheppard.

Robert B. Block, Pomerantz, Levy, Haudek & Block, New York City, for Moses Antler.

Alvin J. Ivers, Alvin J. Ivers, P.C., Aaron M. Fine, Fine, Kaplan & Black, Philadelphia, Pa., for Abraham S. and Rita S. Cott.

Stuart L. Shapiro, Skadden, Arps, Slate, Meagher & Flom, New York City, for Jay E. Leshaw, Harold D. Berkowitz, M. Peter Schweitzer, Manuel Yellen, James J. Needham and Peter Escheverria.

William R. Glendon, Rogers & Wells, New York City, Alan S. Fellheimer, Fellheimer, Eichen & Goodman, Westmont, N. J., for Caesars World, Inc.

Robert B. Barnett, Williams & Connelly, Washington, D. C., for Stuart Z. Perlman and Clifford S. Perlman.

William H. McElnea, Jr., pro se.

Michael R. Griffinger, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for defendant directors (other than Perlmans).

Clyde A. Szuch, Murray J. Laulicht, Pitney, Hardin, Kipp & Szuch, Morristown, N. J., for defendants Perlmans.

Mark S. Shane, DeMarco, Lore & Shane, Dunellen, N. J., for plaintiffs.

## OPINION

BROTMAN, District Judge.

This opinion enlarges upon and supersedes the comments made orally by the court on December 28, 1981, in denying plaintiffs' motion for a temporary restraining order.

Plaintiffs, shareholders bringing this derivative action, made an application on December 22, 1981, for a temporary restraining order, pending hearing of their motion for a preliminary injunction. They seek to stay the taking of any action at a shareholders' meeting scheduled for December 29, 1981, in connection with the purchase of securities by Caesars World, Inc. from Clifford and Stuart Perlman. The Perlmans, substantial shareholders of Caesars World as well as directors on leave of absence, own 18.2 per cent of Caesars World stock and 2.4 per cent of Caesars New Jersey, an 85 per cent-owned subsidiary of Caesars World. Caesars World agreed to purchase their shares for close to one hundred million dollars, which was approximately twice the market price at the time of the agreement in October of 1981. This transaction was agreed to by the board of directors as a means of complying with the order of New Jersey Casino Control Commission requiring Caesars to either sever ties with the Perlmans or withdraw from the casino industry in Atlantic City. *In the Matter of the Application of Boardwalk Regency Corporation and the Jemm Company for Casino Licenses,* Docket No. 80–CL–1, Final Order Granting Conditional Casino Licenses, October 25, 1980 (Plaintiffs' Exhibit E). Caesars World, Inc.'s appeal of the Commission's order is pending before the Supreme Court of New Jersey, Nos. A–810–80 and A–951–80.

Plaintiffs allege that a proxy statement issued December 4, 1981, soliciting shareholder approval of the purchase, is materially false and misleading in violation of federal securities law, specifically Section 14(a) of the Securities Exchange Act of 1934 and Rule 14–a9 promulgated by the Securities Exchange Commission, 15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a9. The complaint alleges the following misstatements or omissions:

1.  the failure to state that the Perlman defendants are not entitled to vote their shares on the proposal;

2.  the failure to describe adequately a number of derivative actions challenging the purchase;

3.  the failure to describe adequately the effect of the departure of the Perlmans on the operations of Caesars;

4.  the failure to describe the financial effect of the Perlman buy-out on the continuing operations of Caesars, including its competitive position in the future;

5.  the failure to describe adequately the reasons why the New Jersey Casino Control Commission imposed conditions on the granting of the casino license to Caesars' New Jersey subsidiary, including the reasons for finding defendants Stuart and Clifford Perlman not qualified to be stockholders of a licensee;

6.  the failure to disclose or issue correcting proxy materials disclosing the existence of a proposal from Resorts International, Inc. to buy the Perlmans' securities at a price which plaintiffs believe approximates the price offered by Caesars; and

7.  the conveyance to the shareholders by the proxy materials, and in particular the proxy card, of the misleading impression that the company is faced with only two alternatives: the proposed buy-out at $98,891,485 or a complete withdrawal from Caesars' highly profitable New Jersey operations, when in fact a third alternative exists, that is, for the Perlmans to sell their securities to a third party. That misleading impression is reinforced by the failure to disclose the existence of the Resorts' offer described in paragraph 6.

In seeking temporary injunctive relief, plaintiffs bear a heavy burden. To grant the injunction, we must determine that plaintiffs have made four necessary show-

ings: first, that they have a reasonable probability of eventual success on the merits; second, that the corporation, on whose behalf they have brought suit, will suffer irreparable injury *pendente lite* if relief is not granted to maintain the status quo; third, that the balance of the parties' hardships, if relief is granted, weighs in favor of plaintiffs; and fourth, that the public interest will be served by granting injunctive relief. *A. O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3rd Cir. 1976); *Gewertz v. Jackman*, 467 F.Supp. 1047, 1055 (D.N.J.1979).

I. *Likelihood of Success on the Merits.*

To succeed on the merits on plaintiffs' Section 14(a) claim, the plaintiffs must demonstrate that the defects in the proxy statement are material. Materiality has been defined by the Supreme Court as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills [v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593, (1970)]* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted). Another formulation of the test is

> whether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other

side, whereas in the absence of this he would have taken a contrary course.

*Jewelcor, Inc. v. Pearlman*, 397 F.Supp. 221, 241 (S.D.N.Y.1975), *quoting General Time Corp. v. Talley Indus., Inc.*, 403 F.2d 159, 162 (2nd Cir. 1968).

Several of the plaintiffs' contentions regarding matters in the proxy statement seem, at this early point in the case, to be meritorious. We will discuss these points in turn.

The first contention of the plaintiffs is that the proxy statement's failure to disclose that the Perlmans are barred from voting their stock in favor of the proposal is materially misleading. The proxy statement recites, at page 2, that the Perlmans "are permitted to, and intend to, vote on the proposal" regarding the stock acquisition, and that they are expected to vote in favor of the purchase. Defendants assert that these statements are wholly true, on the basis of recent action by the New Jersey Casino Control Commission.

The facts behind this dispute are as follows. On October 25, 1980, the Commission ordered, in paragraph 3(a) of its Final Order, (Plaintiffs' Ex. E) that, "With regard to any securities of Boardwalk Regency Corporation, Caesars New Jersey and Caesars World, Inc. held or beneficially owned by Clifford or Stuart Perlman: (a) neither Clifford nor Stuart Perlman shall be permitted to exercise, directly or through any trustee or nominee, any right conferred by such securities . . . ." This order precluded the Perlmans from voting their stock. The Supreme Court of New Jersey affirmed the Commission's order in this respect on November 20, 1980, by ordering that this provision, among others, is "to remain in full force and effect." Paragraph 2(B) of the Order of the New Jersey Supreme Court, Plaintiffs' Exhibit G. The Supreme Court further ordered, in paragraph 2(C), "Any party may apply to the Appellate Division or, on leave granted, to this Court to supplement or modify the terms of the stays hereby granted." By taking this action, the Supreme Court placed its imprimatur on certain aspects of the Commission's order,

superseding that order with its own. Two weeks ago, on December 15, 1981, the Casino Control Commission, on petition of Perlmans' counsel, determined that the proposed stock acquisition was a permissible method of complying with its order. The Commission further unanimously agreed that paragraph 3(c) of its order be modified to allow the Perlmans to vote their shares on the proposed purchase. This decision was reflected in portions of a transcript of the December 15 meeting which defendants provided to the court. (Although references in transcript are made to the Commission's order of October 26, it is evident from the context that the Commissioners meant to refer to the October 25, 1980, order which is discussed above.)

Although the Commission purported to allow the Perlmans to vote their stock, it can be forcefully argued that the Commission's action was of no effect, by virtue of the fact that the Supreme Court's order had superseded the Commission's order. The Supreme Court's authority is expressed in its November 20, 1980, order which deprived the Perlmans of the right to vote their stock. The Supreme Court made clear provisions for modification of its order: such could be requested by application to the Appellate Division or, leave granted, to the Supreme Court. Since the Commission's December 15th action was never adopted by either of the courts so designated, it may well not be an effective modification of the previous order. Technically, the appropriate procedure would have been to make an application to the Appellate Division or Supreme Court to obtain a revision of the order prohibiting the Perlmans from exercising any right conferred by the securities.

This leads to the conclusion that, after all, the Perlmans are not entitled to vote their stock. The proxy statement's information to the contrary may constitute a materially false misstatement under Section 14(a) of the Act. The representation that such a large portion of the shares, close to twenty per cent, is to be voted in favor of a proposal may have influenced some shareholders, leading them to believe that the proposal would inevitably pass, or that opposition would be futile. The Third Circuit Court of Appeals has stated:

> To tell the body of shareholders that a group of five shareholders had agreed to vote for the merger whose votes when added to those of the McLean interests who were promoting the merger would constitute very close to the required two-thirds majority, was to indicate that opposition was almost certainly doomed to defeat and such a statement would surely discourage careful consideration of the merits of the plan of merger and even voting on it at all.

*Gould v. American-Hawaiian Steamship Co.*, 535 F.2d 761, 772 (3rd Cir. 1976). While it is true that the Perlmans do not own a majority of the shares, as did the shareholders in *Gould*, we believe that their block of shares is sufficiently large that to indicate that it would be voted in favor of the purchase could have influenced a shareholder deciding how to vote.

The second contention of plaintiffs that we believe may be meritorious is that the failure to describe adequately the effect of the departure of the Perlmans on the operations of Caesars is materially misleading. In this regard, we note that the decision to divest the Perlmans was reached after a great deal of resistance to that option. Before the Commission and the Superior Court the defendants have always taken the position that the Perlmans were essential to the success of Caesars World and Caesars New Jersey. The Appellate Division of the Superior Court of New Jersey stated in its opinion in this matter,

> One of the expressed concerns of all the appellants is that the Perlmans are such a prime force in the corporate structure and interstructure that their departure would seriously impair the capacity of the corporations to borrow money and otherwise intrude upon the financial operations of the corporations to their detriment.

*In re Boardwalk Regency Casino License Application*, 180 N.J.Super. 324, 434 A.2d

1111, 1114 n.1 (1981). It is possible to conclude that the failure to describe the apparently critical importance of the Perlmans is a material omission because, if shareholders were aware of this cost of the transaction to the corporation, they might choose to support another alternative, that of selling the New Jersey operations.*

The final point on the merits is the failure to disclose the existence of an offer from Resorts International to purchase the Perlmans' shares. In a press release dated December 15, 1981, it was announced that the Perlmans rejected an offer from Resorts because the price agreed upon with Caesars was higher. Defendants' Exhibit 3. The Resorts offer was approximately $16.50 per share. Counsel for the Perlmans reported this development to the New Jersey Casino Control Commission on December 15, 1981.

Plaintiffs strenuously argue that this offer should have been disclosed in the proxy statement or correcting materials, to indicate to shareholders that they are not restricted to only two unappealing options: buy out the Perlmans at a high cost to Caesars or lose the New Jersey casino license. The Resorts offer represents a potential third option which shareholders may find the most desirable. Plaintiffs assert that the nondisclosure of the Resorts' alternative is a material omission. *Cf. Kohn v. American Metal Climax, Inc.*, 322 F.Supp. 1331 (E.D.Pa.1971), *aff'd*, 458 F.2d 255 (3rd Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972) (failure to disclose possibility of alternative plans and creating the impression that the plan presented was the only viable one held materially misleading); *U. S. Smelting, Refining & Mining Co. v. Clevite*, 1969–70 CCH Fed.Sec.L.Rep. ¶ 92,691 (N.D.Ohio 1968) (proxy statement failed to disclose alternative merger proposals. Such alternatives were of great materiality, particularly where "the other defini-

tive proposal or proposals *may* be of greater advantage to the shareholders than the one submitted by management").

Defendants respond, first, that the defendants are under no obligation to disclose "every conceivable alternative" or the "panoply of possible alternatives," citing *Umbriac v. Kaiser*, 467 F.Supp. 548 (D.Nev.1979) and *Allen v. Penn Central Co.*, 350 F.Supp. 697 (E.D.Pa.1972). Second, defendants characterize the Resorts offer as a "tentative interest or inquiry," "casual" and "preliminary" discussion, which was not sufficiently concrete as to require disclosure. *See, e.g., Scott v. Multi-Amp Corp.*, 386 F.Supp. 44, 65 (D.N.J.1974). Plaintiffs' authority, *U. S. Smelting, supra*, defendants argue, is distinguishable because it involved a definite, firm offer.

At this point in this case, we are unable to determine whether or not the Resorts offer was firm, tentative, or somewhere in between. We can say, however, that if it is found to be a reasonably realistic proposal, the failure to mention it in the proxy statement would be a material omission. We consider that such an offer could be of importance to a shareholder in determining how to vote the proxy.

On the basis of the foregoing, we find that plaintiffs have satisfied the first of the four criteria for temporary injunctive relief. As to the remainder of plaintiffs' arguments, at this point, we do not believe that plaintiff has demonstrated a likelihood of success on the merits. Without prejudging or foreclosing those claims, we do not find it necessary to discuss them in detail at this stage.

II. *Irreparable Harm.*

But even a strong showing of probable success does not entitle plaintiffs to immediate injunctive relief. There must also be a showing that the corporation, on whose

---

* Plaintiffs also argue, in a related vein, that the purchase of these securities will have an adverse effect on Caesars' financial condition, particularly on its capacity to borrow money for expansion of Atlantic City facilities, and that this impact was not adequately disclosed.

We agree with defendants that the financial information disclosed on page 13 of the proxy statement was fully adequate in this regard. *Rodman v. Grant Foundation*, 608 F.2d 64, 72 (2nd Cir. 1979).

behalf plaintiffs sue, will suffer irreparable harm if the relief requested is not granted. *A. O. Smith Corp. v. F.T.C., supra; Joseph Bancroft & Sons Co. v. Shelley Knitting Mills*, 268 F.2d 569 (3rd Cir. 1959). It is proper to deny preliminary injunctive relief solely upon a finding that irreparable harm has not been demonstrated. *Oburn v. Shapp*, 521 F.2d 142, 151 (3rd Cir. 1975), *citing Commonwealth of Pennsylvania ex rel. Creamer v. U. S. Dep't of Agriculture*, 469 F.2d 1387, 1388 (3rd Cir. 1972).

■ Irreparable injury is "substantial injury to a material degree coupled with the inadequacy of money damages." *Judice's Sunshine Pontiac, Inc. v. General Motors Corp.*, 418 F.Supp. 1212, 1218 (D.N.J. 1976); *Tully v. Mott Supermarkets, Inc.*, 337 F.Supp. 834, 850 (D.N.J.1972). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Judice's Sunshine Pontiac, supra*, 418 F.Supp. at 1222, *quoting Virginia Petroleum Jobbers Association v. F.P.C.*, 259 F.2d 921, 925 (D.C.Cir.1958). Where money damages are sufficient to compensate the injured party, there is no irreparable harm. *A. O. Smith Corp. v. F.T.C., supra*, 530 F.2d at 525.

■ The plaintiffs' fundamental objection to the proposed purchase is that the price per share is too high. This dispute is, at bottom, one about money, and a legal remedy of money damages is available and adequate. The action that is expected to be taken at the meeting on December 29, 1981, the approval of the purchase, and the closing on the agreement the following day, do not present a threat of irreparable injury. If the proxies are ultimately found to be defective, the court may set aside the transaction, order a re-solicitation of proxies, or grant any other necessary relief. *See, e.g., J. I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964) (Section 14(a) empowers court to order recis-

sion, to secure restitution, and even to "enforce the right of restitution against a third party."). To allow the meeting and vote on the proposal to proceed in the face of misleading proxy materials does not in and of itself work an irreparable injury on the party challenging the materials. So long as the court is able to "unscramble" this transaction, we can foresee no irreparable injury to the corporation. *See Plant Industries, Inc. v. Bregman*, 490 F.Supp. 265 (S.D.N.Y. 1980).

We do not agree with plaintiffs' view that closing on the sale will result in damage to the corporation that cannot be undone. We find most of plaintiffs' predictions of harm to be speculative at best, for example, that the deal will have a "chilling effect" on other, unknown potential buyers of the Perlmans' stock. Likewise, the discussion at oral argument about the creation of a new control situation of the corporation, and an attendant disincentive to potential take-over bidders, if any surface, seems rather remote.

The structure of the proposed sale is an exchange of all of the Perlmans' shares for close to thirty million dollars in cash and the remainder of the purchase price in notes, to be paid in six equal annual installments commencing in January 1983. Plaintiffs' suggestion that the immediate cash payment will "adversely affect the corporation's development prospects" has not been proven to the court's satisfaction. As defendants point out, it is possible that the purchase will enhance the company's borrowing power, by removing the cloud of uncertainty that has hung over Caesars since the Commission's order in October 1980. The argument that the Perlmans may invest the initial payment of thirty million in some irretrievable manner does not dissuade the court from denying the restraining order. This risk is run in every case where plaintiffs seek damages. There are well-established methods for enforcing a judgment, if one is eventually rendered in plaintiffs' favor.

The only real suggestion of possible irreparable harm was made by counsel at oral

argument, that if the Perlmans negotiated Caesars' notes to a holder in due course, the corporation would be irrevocably obligated to pay the third party, and the transaction could not be effectively undone. The defendants responded by stating that any potential holder of notes of this magnitude would be of such sophistication as to have knowledge of their disputed status. While there has been no showing that such negotiation will indeed take place, we believe it is prudent to ensure the court's remedial avenues by requiring defendants to notify any such third parties regarding this litigation. In this way, we protect the plaintiffs and foreclose the possibility of a holder in due course whose rights could hamper remedial action or, alternatively, whose rights might be unfairly prejudiced by a final order of recission.

Having reached the conclusion that the request for a temporary restraining order must be denied due to the lack of irreparable harm, it is unnecessary to analyze the remaining criteria for immediate injunctive relief. An order has been entered on December 28, 1981 denying plaintiffs' application and directing that defendants give notice in accordance with this opinion.