**Alene S. AMMOND, in her capacity as a member of the Senate of New Jersey and Individually, et al., Plaintiffs,**

**v.**

**Joseph L. McGAHN et al., Defendants.**

**Civ. A. No. 75–163.**

United States District Court,
D. New Jersey.

March 5, 1975.

656

Tomar, Parks, Seliger, Simonoff &
Adourian by William Tomar, and Ronald
A. Graziano, Camden, N.J., for plain-
tiffs.

Warren, Goldberg & Berman, by Da-
vid J. Goldberg, Trenton, N.J., for de-
fendants.

## OPINION

COHEN, Senior District Judge:

Perhaps, for the first time in the history of the New Jersey State Legislature, a federal court is asked to decide whether a political caucus may exclude one of its members for her critical public statements without violating the First and Fourteenth Amendments to the Federal Constitution.

Thus, on this application for a preliminary injunction enjoining the defendants from denying her access to the Caucus, issues are presented of constitutional dimension.

Plaintiff, Alene S. Ammond, in November, 1973, was elected to the New Jersey State Senate by the voters of the Sixth Senatorial District, encompassing parts of Camden and Burlington Counties. Prior to the general election, she was victorious in a three-way Democratic primary contest. Consequently, when she assumed her senatorial duties in January, 1974, she did so as a Democrat. Plaintiffs Zelda Karp, Lee A. Paull and Francis J. Powers are residents of the Sixth Senatorial District and are represented by Senator Ammond in the State Senate.

The defendants are 28 Democratic Senators who comprise the New Jersey State Democratic Caucus; the Sergeant-at-Arms of the State Senate; the Executive Director of the Senate Majority; and both counsel for the Senate Majority Caucus.

The complaint [1] alleges a cause of action arising under 42 U.S.C. §§ 1983, 1985. This court, therefore, has jurisdiction pursuant to 28 U.S.C. §§ 1343(3) and (4).

It is contended by the plaintiff, Senator Ammond, that the decision by her fellow-Democratic Senators to exclude her from the Caucus was in retaliation for public statements she made regarding the Caucus and its members; that the Senate Democratic Caucus is a vital and integral part of the New Jersey State Legislative process; and that her right of free speech guaranteed under the First Amendment has been violated.

Plaintiffs, Karp, Paull and Powers contend that the exclusion of their duly elected representative from the Caucus denies them the Equal Protection of the Law guaranteed by the Fourteenth Amendment.

Mindful of the somewhat analogous situation presented in Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) and the constitutional mandate of equal representation for all, *see* Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964); and Chapman v. Meier, 420 U.S. 1, 95 S.Ct. 751, 42 L. Ed.2d 766 (1975), this court on January 31, 1975 issued a temporary restraining order enjoining the defendants from denying Senator Ammond access to the Caucus. February 10, 1975 was set as the return day for the hearing on the application for a Preliminary Injunction. At the request of counsel for defendants, a continuance was granted, and the T.R.O. was extended until February 18, 1975, the date set for the Preliminary Injunction proceeding.

In opposition to the application for preliminary injunctive relief, the defendants move for dismissal of the complaint and the amended complaint, or, in the alternative, for the reallocation of this case to the Trenton vicinage, urging several grounds which will be considered *seriatim*.

## IMMUNITY AND STATE ACTION

■ First, defendants argue that they are immune from civil liability under the Civil Rights Act. In support of immunity, defendants cite Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). *Tenney*, however, does not represent a principle of absolute legislative immunity, for in finding

---

1. The original complaint sought only injunctive relief. An amended complaint filed on February 11, 1975 seeks, in addition to injunctive relief, damages and counsel fees.

that the members of the legislative committee were not subject to suit, the Supreme Court pointed out:

> "We conclude only that here the individual defendants and the legislative committee were acting in a field where legislators traditionally have power to act, and that the statute of 1871 does not create civil liability for such conduct." 341 U.S. at 379, 71 S. Ct. at 789.

Thus, *Tenney* acknowledges that immunity is limited to those areas in which legislators may traditionally act.

■ The complaint in Bond v. Floyd, *supra,* was filed in the District Court alleging a cause of action, *inter alia,* under § 1983. *See* 251 F.Supp. 333, 335. Upon appeal, the Supreme Court held "that the disqualification of Bond from membership in the Georgia House because of his statements violated Bond's right of free expression under the First Amendment," 385 U.S. at 137, 87 S.Ct. at 350. It is inconceivable, given the history and purpose of § 1983, that the defendants in the instant case are cloaked with an unqualified immunity. Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974), relied upon by defendants, is not to the contrary. In *Scheuer,* the representatives of three students who died during the incident at Kent State University brought a § 1983 action naming as defendants the Governor, the Adjutant General, various members of the Ohio National Guard, and the President of Kent State. The court decided that, at best, the defendants had a qualified immunity, and left no doubt that the claim of immunity might not withstand the broad reach of federal power. In doing so, the court noted:

> Under the criteria developed by precedents of this Court, § 1983 would be drained of meaning were we to hold that the acts of a governor or other high executive officer have "the quality of a supreme and unchangeable edict, overriding all conflicting rights of property and unreviewable

through the judicial power of the Federal Government." Sterling v. Constantin, 287 U.S. [378], at 397 [53 S. Ct. 190, 195, 77 L.Ed. 375]. In Sterling, Mr. Chief Justice Hughes put it in these terms:

> "If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the State may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable. There is no such avenue of escape from the paramount authority of the Federal Constitution. When there is a substantial showing that the exertion of state power has overridden private rights secured by that Constitution, the subject is necessarily one for judicial inquiry in an appropriate proceeding directed against the individuals charged with the transgression." (citation omitted) 416 U.S. at 248–49, 94 S. Ct. at 1692.

■ There can be no doubt that the First and Fourteenth Amendment rights, which plaintiffs claim have been infringed, come within the ambit of § 1983. Defendants while not conceding that the conduct of the Caucus is "state action," within the meaning of the Civil Rights Act, seem to rest primarily on the defense of immunity. Plaintiffs, on the other hand, maintain that the Caucus is inextricably bound up with the affairs of the Senate, and, therefore, a symbiotic relationship exists between the Caucus and the Senate. If this contention is true, then this case would be controlled by the rationale of Burton v. Wilmington Parking Authority, 365 U.S.

715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). There is, however, some authority which indicates that *Burton* may be limited to lessees of public property. Jackson v. Metropolitan Edison Company, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Notwithstanding that distinction, if, as plaintiff alleges, the Caucus is a vital and integral part of the legislative process, then there can be no question as to state action. For, as the Supreme Court indicated in *Jackson, supra*, "We have of course found state action present in the exercise by private entity of powers traditionally exclusively reserved to the State. (citations omitted). If we were dealing with the exercise by *Metropolitan* of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one." 419 U.S. at 352, 95 S.Ct. at 454. Thus, the question presented here resolves itself to whether the Caucus is, in fact, an integral part of the legislative process in New Jersey.

In deciding this issue, the testimony of Senator Ammond, supported by that of Bolton Schwartz, who has been characterized as the "Dean of the Press Corps," must be considered. At the hearing,[2] it was revealed that on or about January 20, 1975, in her absence, the Democratic Caucus voted unanimously to exclude Senator Ammond from the Caucus. She received no official communication informing her that she had been so barred, nor was she accorded any hearing whatsoever in connection with her exclusion. On January 27, 1975, she attempted to attend the regularly scheduled meeting of the Caucus. The sergeant-at-arms barred her entry, and informed her that the President of the Senate, Frank J. Dodd, had authorized him to convey to her that she could not enter the Caucus as a result of the exclusion vote adopted the previous week. Senator Ammond maintains that the decision to exclude her was in retaliation for public statements she made regarding the Caucus and its members.

The Caucus is a body composed of all Democratic members of the State Senate who receive compensation from the State of New Jersey. Its sessions are conducted in the State House on State property and attended by elected and appointed State officials; it is serviced by State paid employees, who include, among others, the sergeant-at-arms for the Senate, the Executive Director of the Senate Majority and its counsel; and notice of the Caucus meetings, by telegrams listing proposed legislative bills and other matters on the agenda, are paid by the State.

Bills pending before the Senate are discussed by their sponsors followed by general discussion and debate among the members of the Caucus. The views of members of the Executive Branch of the State Government are presented. Often, "Straw" votes are taken to determine the likelihood of passage of a bill. Since the Democratic members of the Senate are a large majority, the result of a "Straw" vote will often determine the outcome of a bill on the floor of the Senate. Bills which do not command a majority are often withdrawn. Majority counsel participate in the Caucus and render advisory opinions on the legislative proposals.

Additionally, a "consent list" is prepared in Caucus, consisting of those bills which will pass on the floor without debate. The purpose of this list is to free legislative time by obviating the necessity for debate on routine matters.

It is the determination of the Court that the Caucus functions as an arm of the State Legislature and is an essential part of the legislative process in New Jersey. We hold that the Caucus exercises legislative power which is normally associated with sovereignty

2. In light of the immediacy of the threatened harm and the public interest involved, the court, in the interest of dispatch, made an oral determination that preliminary injunctive relief be granted. It was further indicated that, given the importance of this matter, a written opinion would be filed supplementing and amplifying the oral opinion.

and, therefore, action by the Caucus is "state action" within the meaning of 42 U.S.C. § 1983. *Jackson, supra;* Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

The Caucus is not, as the defendants attempted to elicit on cross-examination, an informal social gathering—a luncheon club consisting of members of the same political party. It conducts the business of the State. Plaintiff's Exhibits P1 and P2, introduced in evidence, are telegrams paid for by the State, signed by Frank J. Dodd, Senate President, addressed to Senator Ammond at her residence, notifying her that the Senate will convene on a specified date; requesting her to be prepared to vote on certain enumerated Senate Bills; advising her that certain Senate Committees will meet at specified times; and that party conferences will be held at specified times. Obviously, all of the aforementioned State business was to be discussed at the Conference or party Caucus.

■ The exclusion of Senator Ammond from the Caucus in retaliation for her critical public statements is violative of her right of free speech under the First Amendment. Given the fact that the Caucus often decides the course of legislation before it ever reaches the floor of the Senate, exclusion from the Caucus is tantamount to exclusion from the Senate. Thus, this case is governed by Bond v. Floyd, *supra.*

■ It is further determined that the exclusion of Senator Ammond from the Caucus without a prior hearing violates the Due Process Clause of the Fourteenth Amendment. No elected representative of the people may be barred from participation in the forum to which he or she was elected for misconduct, no matter how egregious, without some type of hearing. Bond v. Floyd, *supra; see* Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The action by the Caucus in denying Senator Ammond the opportunity to attend its deliberations deprived her

constituents of the Equal Protection of the law. In effect, the action by the Caucus created two classes of voters. One class consists of those citizens whose Senators could effectively participate fully in the legislative process and another class whose Senator could participate only to a limited degree. As the Supreme Court has indicated:

". . . [T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964).

While it is true that Senator Ammond was not barred from voting on the floor of the New Jersey Senate, her exclusion from the Caucus could vastly diminish her efficacy as an elected representative.

This court need not consider the merits of the controversy between Senator Ammond and her colleagues and while we are not confronted with the question of whether her public statements are defamatory, we note that the alleged "[i]njury to official reputation affords no more warrant for repressing speech that would otherwise be free than does factual error." New York Times Co. v. Sullivan, 376 U.S. 254, 272, 84 S.Ct. 710, 722, 11 L.Ed.2d 686 (1964).

■ We also note, in passing, that if these defendants were to seek redress in the courts for the alleged injury to their reputations caused by Senator Ammond's remarks, they would be met by "[t]he constitutional guarantees . . . that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. at 726; *see* Gertz v. Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). While we intimate no view as to the defamatory nature of Senator

Ammond's statements, it is significant that defendants concede that Senator Ammond's exclusion was a result of her public statements.

It was rather well established from the testimony that Senator Ammond is an outspoken critic of the Legislature and its members. She has been characterized as "The Terror of Trenton." As was legendarily and so forcefully proclaimed by Voltaire[3]:

> "I disapprove of what you say, but I will defend to the death your right to say it."

## MOOTNESS

As an additional argument advanced by the defendants for a dismissal of the complaint, it is urged that in light of Senator Ammond's readmission to the Caucus[4], following the issuance of this court's temporary restraining order, the instant application for injunctive relief is now moot. Since January 31, 1975, the date of the temporary restraining order, a special senatorial ad hoc committee chaired by Senator Wiley was formed to conduct an investigation of this entire matter.

The Wiley Committee recommended that Senator Ammond be readmitted to the Caucus because she had been barred without a hearing and because no written procedures or standards existed for such exclusion.

In view of this argument, a brief discussion of mootness is appropriate.

▮ The doctrine of mootness permits a federal court to hear a case not only when there has been past injury which is continuing, but where there has been past injury which has ceased at some point prior to or during the course of litigation, and "there is [any] reasonable expectation that the wrong will be repeated." United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). This branch of

the mootness doctrine had its genesis in Southern Pacific Terminal Co. v. I.C.C., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). In that case, an ICC order which was the subject of the lawsuit expired before the case reached the Supreme Court. The circumstances which gave rise to the order, however, were of such a nature that a similar order might again be issued in the future. Therefore, the court found that the case was not moot because the orders were ". . . capable of repetition, yet evading review . . .." *Id.* at 515, 31 S.Ct. at 283.

Furthermore, in *W. T. Grant, supra,* the court noted that the defendant's good faith assertion that he would not resume his activity was not sufficient by itself to defeat the court's jurisdiction on grounds of mootness. The court did say, however, that discontinuance of the activity was a factor to be considered. The moving party must demonstrate to the court that the relief sought is needed. The court further stated that "The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." 345 U.S. at 632, 73 S.Ct. at 897. This is certainly a factor in this case.

The key issue is whether the likelihood of a repetition of this action by the Caucus is contingent or remote. In Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), the Supreme Court was confronted with an action for injunctive and declaratory relief brought by employers of workers who were receiving welfare assistance from the State of New Jersey during an economic strike. The strike ended before the case was tried, and the Supreme Court concluded that since the policy of the State of New Jersey was fixed and definite, the case fell within the class "capable of repeti-

---

3. Although this quote is commonly attributed to Voltaire, it is actually a paraphrase of his attitude by S. G. Tallentyre in *Friends of Voltaire* 199 (London, 1907).

4. At or about the same time, the Caucus was opened to representatives of the Press.

tion, yet evading review." The court's rationale in reaching that conclusion was that: "[i]t is sufficient, therefore, that the litigant show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." 416 U.S. at 125–126, 94 S.Ct. at 1700.

An important consideration here is the testimony of Senator Ammond that she was excluded from the Caucus for exercising her First Amendment rights and that it is her firm determination to continue to do so. She maintains that she will uphold her campaign pledge to keep her constituency informed on legislative matters.

In another context the Supreme Court has noted the "chilling effect" which state action may have upon freedom of expression without regard to the ultimate vindication of such rights in a lawsuit. *See* Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). In this regard, it is significant that the Caucus decided to readmit Senator Ammond after this suit was filed. Given the vital interests which plaintiffs seek to protect, the defendants may not avoid judicial scrutiny of their conduct by the simple expedient of ceasing their activity. In United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978 (1952), it was held that "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."

 "It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants 'would be "free to return to . . . [their] old ways." ' " (citations omitted) Allee v. Medrano, 416 U.S. 802, 810–811, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566 (1974).

 This is particularly true when one considers the facts, as conceded in the Wiley committee report, that Senator Ammond was barred without a hearing, and that no standards or procedures currently exist to conduct such a hearing. The absence of such procedures is convincing evidence to this court that a repetition of these events might occur without a modicum of Due Process being accorded to Senator Ammond. We need not address the question of what type of hearing is required. It is sufficient to say that some hearing is necessary. Bond v. Floyd, *supra*; Goss v. Lopez, *supra*. As to the First Amendment issue presented here, it need only be pointed out what was said by the Supreme Court in Bond v. Floyd, *supra*, at 135–36 of 385 U.S., at 349 of 87 S.Ct.:

"The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy."

For the foregoing reasons, this court concludes that the application for a preliminary injunction is not moot.

### REALLOCATION

 The defendants have moved that, should the court deny their motion for a dismissal of the complaint, then, in the alternative, reallocation of the hearing for a permanent injunction should be made to the Trenton vicinage of this court.

On January 31, 1975, when the Temporary Restraining Order was considered and signed, in the presence of counsel for all parties, it was suggested by the court to counsel for the defendants that consideration be given to a motion for reallocation. Nothing was done until a motion was filed on February 13, 1975—a few days prior to the scheduled hearing for the Preliminary Injunction.

Considerable research was made, effort exerted and time consumed by the court in preparation for the hearing. It does not make for judicial economy and

good housekeeping for a matter to be entertained by two judges.

The traditional consideration of the convenience of the litigants, counsel and witnesses does not impose any undue burden or hardship in determining venue.

It is true, as the defendants urge, that they are senatorial representatives from counties all over the State and that the act complained of occurred in Trenton, New Jersey.

It is equally true that some of these defendants represent South Jersey counties. To be borne in mind is that the plaintiffs reside within the Camden vicinage, that Senator Ammond is the duly elected Senator here, her constituency is here, the complaint was filed here, and that Trenton is not all that far (some 30 miles) from Camden which would result in any burdensome inconvenience for the defendants to submit to the jurisdiction of this vicinage.

For all the foregoing reasons, the application for reallocation will be denied.

In determining whether a preliminary injunction should issue, a court must be persuaded by the moving party that: " . . . (1) a reasonable probability of eventual success in the litigation, [exists] and (2) that it will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the status quo." Delaware River Port Authority v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 919–20 (3rd Cir. 1974).

This court believes a preliminary injunction is appropriate. We are convinced that plaintiffs have a reasonable chance of ultimate success in this suit, and that unless injunctive relief is provided, freedom of speech may suffer a chilling effect.[5] This satisfies the requirement of irreparable injury.

At this stage in the litigation, we deem it unnecessary to address plain-

tiff's cause of action under 42 U.S.C. § 1985, since we find a sufficient basis for a preliminary injunction to issue under § 1983.

The foregoing opinion shall, in conformity with Rule 52 of the Federal Rules of Civil Procedure, be in lieu of special findings of fact and conclusions of law constituting the grounds for the court's action.

Counsel may submit an appropriate order.

---

5. At the hearing on the preliminary injunction, the defendants presented no testimony. Thus, the evidence presented by the plaintiffs was uncontradicted except for the affidavit of Senator Dodd. At this point, defendants have not filed their answer. Consequently, the factual record amply supports the issuance of an injunction.