**MUAVAEFA`ATASI AE AE, Jr., Plaintiff,**

**v.**

**THE HOUSE OF RPRESENTATIVES OF AMERICAN SAMOA
and MATAGI RAY MAILO McMOORE, SPEAKER OF THE
HOUSE, Defendants.**

High Court of American Samoa
Trial Division

CA No. 13-03

June 26, 2003

Before KRUSE, Chief Justice, ATIULAGI, Associate Judge, and MAMEA, Associate Judge.

Counsel: For Plaintiff, Paul F. Miller
 For Defendant, Charles V. Ala'ilima

## OPINION & ORDER

In what is perhaps becoming an all too frequent occurrence, we are called on again to resolve a dispute originating within the Legislative Branch. At issue is the extent of the House of Representatives' power to punish its own members and what procedures, if any, they must follow when exacting punishment.

# I. FACTUAL BACKGROUND

Based on the evidence adduced at trial, we make the following findings: Plaintiff, Muavaefa`atasi Ae Ae Jr., ("Muavaefa`atasi") is the duly elected Representative for House district No. 9, Maoputasi No. 3, encompassing the village of Pago Pago. On Friday, February 7, 2003, the House Committee on Parks and Recreation met on the House floor to discuses a pending resolution that had been introduced by Muavaefa`atasi. The Committee had "resolve[d] itself into a committee of the Whole," House Rules III(2)(C), which allows any representative to sit in on the meeting. Thus, Muavaefa`atasi, though not a member of that committee, was in attendance.

The resolution concerned a measure for sanitary improvements in Pago Park. Plaintiff's concern was the use of the park for a number of public events, such as cricket games, although lacking in adequate public toilet facilities in the area. In attendance, therefore, at the hearing as witnesses were the Director of Public Works as well as the Director of Parks and Recreation. During the hearing, Muavaefa`atasi became agitated; he felt that other representatives were using the forum to make derisive remarks about his village, and hence the dignity of the Maoputasi. For example, at one point, Muavaefa`atasi had remarked about people being forced to use the surrounding trees and bushes because of the lack of public bathrooms. Representative Fetu Fetui, Jr., ("Fetui") seized on that to facetiously ask the Director of Parks and Recreation: *"poo ni tagata soifua, vae ane, tulou le maota, poo ni ta`ifau o fa`atitipa solo* (whether it was people or, with due respect to the dignity of this meeting place, *"ta`ifau"* (pets or dogs) that were defecating in the park)?" The director, quite rightly, replied that that was not part of his department's duties.

When Muavaefa`atasi was finally given the opportunity to speak, he attempted to refocus the dialogue. However, he was repeatedly interrupted by Representative Atualevao *Gafa*tasi Afalava ("Afalava"). Muavaefa`atasi had to request the chairman to direct Afalava to allow him to continue. Even after the chairman had sided with Muavaefa`atasi's procedural position and had given the latter leave to continue with his statement, Afalava was not to be quieted; he continued to interrupt Muavaefa`atasi. Whereupon, the chairman, perhaps in exasperation, ruled: *"Afioga Afalava o le a fa`auma. Muavae, fail sau saunoaga rnulimuli o le a fauma le tatou iloiloga* (Honorable Afalava it is going to be closed. Muavae, make your final remarks as our hearing is going to be closed.)" Muavaefa`atasi then abruptly concluded his presentation but not without suggesting to the chairman, *"ae sili ona fa`atonu au ta`ifau ia, vae ane le marnalu Ole Maota, e sill ona salapu le gutu* (it would be best if you instruct your pets or dogs, with due respect to the dignity of this meeting place, that they should shut their

mouths)." The audio record then reveals an ensuing heated dialogue between Afalava and Muavaefa`atasi:

Afalava: Ua tele le le mafaufau o oe. (You have been very disrespectful.)

Muavae: Leaga . . . nuu o matou. Ua te-le lau tala na fai ile matou nu`u. (Because . . . it is our village. You have made derogatory statements about our village.)

Afalava: Tautala lou gutu, ae te pala`ai. Ua e iloa. Tautala lou gutu ae te pala`ai. (Your mouth speaks, but you are cowardly. You know. Your mouth speaks, but you are cowardly.)

Muavae: E te tautala e a? (Why do you speak at all?)

Following an audible suggestion from somebody that the two ought to take themselves outside, there followed a clamorous and rowdy exchange, which is largely indecipherable. Muavaefa`atasi had to be restrained. Eventually, he left the House floor and went to his office.

After calm had been restored and after the chair had excused and apologized to the witnesses, the committee continued with their meeting and discussed, at the request of Afalava, what had just transpired. The committee decided to report the incident at the next regular session of the House, which was scheduled for 10:00am that very same morning, along with the recommendation that Muavaefa`atasi be punished.

At the regular session, the committee chairman made an oral[1] committee report to the House with the recommendation, "*[e] [t]atau ona fa`amalolo sina tasi pe lua vaiaso* ([that Muavaefa`atasi] should be suspended for a week or two." The report sparked a debate as to what sort of discipline should be meted out: the possibilities ranged from forgiveness to suspension. The Speaker of the House, Matagi Ray McMoore ("Matagi"), referred the matter to the House Standing Committee on Rules and Procedures[2] to be taken up the next Monday, February 10, 2003.[3]

---

[1] In apparent contradiction to House Rules which requires a Committee report to be in writing. House Rules III(4)(A).

[2] The assignment of this matter to the Rules Committee is curious, given the scope of that Committee's jurisdiction. The Rules Committee deals with "all proposed amendments to House Rules and adjournment resolutions. In addition, the Committee may provide guidelines for member travel, committee meeting rooms and committee staff and for the introduction of bills." House Rules III (1)(B)(1).

[3] The House actually complied with its own internal rules regarding notice. Committee meetings must be announced "at least 3 calendar

Two things are particularly significant about the Friday session. First, Muavaefa`atasi himself was not present. After the committee meeting, Muavaefa`atasi took some additional time to collect himself and he did not go to the regular session until the debate regarding his punishment had ended. Thus, Muavaefa`atasi did not have actual notice of the scheduled Rules Committee meeting for Monday. Second, there was never a debate as to whether Muavaefa`atasi had actually violated any rule or law or whether he was generally disorderly. Instead, misconduct was presumed and the discussion simply focused on the extent of the punishment.

That Monday, the Rules Committee met "of the Whole" to discuss Muavaefa`atasi's fate. Muavaefa`atasi was not in attendance, as he was, according to his testimony, feeling ill that day--though it is not clear that he even knew the meeting was taking place. At the hearing, the representatives in attendance discussed the incident. The committee voted unanimously in favor of discipline. At that point, the debate turned to whether the punishment should be expulsion or merely suspension. The record of the proceedings revealed that after an inquiry as to applicable law and after the chairman, Vice Speaker Savali Talavou Ale, had advised that expulsion required a two-third's majority, whereas the law was silent on suspension (*fa`amalolo*), Afalava moved as follows:

> *Ua le manino i afioga i ali`i faipule. O lo`u manatu lea sa avatu pei ona e maua mai, amata atu nei fa`ato`ā toe fo`i mai le afioga i le ali`i faipule pe a toe a`e le Fono ia Iulai. Leai se totogi, prohibit, `aua ne`i toe sau i totonu o le compound e le fa`aaoga foi le ofisa. `Aua ne`i toe sau i totonu o le ofisa. O le condition lea o la`u lafo lea oute avatu. Fa`afetai.* (It is not clear to the honorable representatives. My opinion previously presented is that it should start now and the honorable representative can return when the Fono reconvenes in July. No pay, prohibit, nor may he enter into the compound to use the office. He may not come to the office. These are the conditions of my motion I am presenting. Thank you.)

While Muavaefa`atasi garnered some support in the form of pleas for leniency, a majority of the committee eventually voted, nine to two, to adopt Afalava's motion for suspension until the July session, including forfeiture of pay, allowances, access to his office and House grounds.

---

days in advance of the meeting date." House Rules III(3)(B). However, it is unclear whether they also "include[d] the meeting and agenda in the daily journal," as further required by that same rule.

121

Later that morning, the House convened a regular session and took up the disciplinary matter. A quorum was present. By motion, the Rules Committee chairman orally introduced the recommendation[4] of discipline adopted earlier that morning. Although representative Lavea Seali`itu F. Mauga rose in an effort to further address the issue and invite further reflection, the Speaker summarily called a vote on the Rules Committee's recommendation to suspend. When the vote was called, the recommendation passed by a vote of eleven to three. Eleven comprises a bare majority of the entire House Consisting of 20 voting members and 21 total members. *See* AM. SAMOA REV. CONST. art. II, § 2.

Though it is unclear what sort of notice is normally required in order to put an item on the day's agenda, it is obvious that no advanced notice was given that the suspension vote was going to take place. Furthermore, there is no indication that any representative, at any time, paused to consider that Muavaefa`atasi was not present at any session or committee meeting in which his suspension was discussed. Muavaefa`atasi obviously then did not have an opportunity to present a defense, call witnesses, or even speak.

Following the session, Matagi wrote a letter to Muavaefa`atasi advising him of his suspension. The letter was delivered to Muavaefa`atasi at his residence later that evening. For some reason, Muavaefa`atasi did not read the letter but instead brought it with him on Tuesday, February 11, 2003. When he entered the House floor that morning, Matagi inquired whether Muavaefa`atasi had read the letter. Affirming that he had not, Matagi informed Muavaefa`atasi that the House had voted to suspend him. Muavaefa`atasi requested to address the House but leave was denied him.[5] The Sergeant-at-Arms was directed to escort Muavaefa`atasi out and prohibit him from even entering his office. Not wanting to get the Sergeant-at-Arms in trouble, Muavaefa`atasai complied. When he attempted to return to his office later that week, he found that the locks had been changed.

The suspension is still in effect. Since February 11, 2003, Muavaefa`atasi has not had access to his office, his supplies, his staff, or the House generally. He has nonetheless tried his best to serve his district, doing what he can outside of the legislative context. But, for all

---

[4] Motions may be made orally. House Rules IV(6)(B). But again, committee reports, including any findings and recommendations, must be in writing. House Rules III(4)(A). This recommendation was not.
[5] Despite the fact that the House rules allow for reconsideration of any vote. House Rules IV(7).

intents and purposes, house district No. 9, Maoputasi No. 3, has remained without representation.

## II. CLAIMS FOR RELIEF

■ Muavaefa`atasi urges relief on several grounds. He seeks three declaratory judgments: 1) that the House's conduct is an unconstitutional restraint on his right of free speech; 2) that the House's conduct is an unconstitutional taking of a property interest; and 3) due to the House's unconstitutional conduct, the suspension is a nullity and without authority. As we understand his second and third claim, Muavaefa`atasi is challenging whether or not the House afforded him due process of law by using the procedures, as previously detailed, in conducting the hearings and by imposing such a severe sentence. The defendants seem to agree with this interpretation. There is no question that, with the exceptions discussed below, these three issues are properly before us, ripe for review, and not barred by any jurisdictional impairment. *See, e.g., Agaoleatu v. Matagi*, 7 A.S.R.3d 64, 68 n.3 (Trial Div. 2003) (Court should not interfere in legislative controversies unless they present conduct inconsistent with the Constitution); *Fa`amausili v. The Senate*, 6 A.S.R.3d 259, 263-64 (Trial Div. 2002); *Dank v. Benson*, 5 P.3d 1088, 1094-96 (Okla. 2000) (Opala, J., concurring) (impairment of a lawmaker's access to informed deliberation is justiciable).

Muavaefa`atasi also seeks a writ of mandamus against Matagi, as Speaker of the House: 1) granting Muavaefa`atasi all the rights and privileges accorded any representative; and 2) affording him all the rights and privileges guaranteed by the American Samoa Revised Constitution and the Constitution of the United States. We would be apprehensive to entertain such relief because in so doing, we would be confronted with constitutional issues concerning separation of powers, legislative immunity, and the inherent powers of the court. We think such a discussion is better left for another day, when it appears wholly necessary.

■ Rather, "[a] court may grant declaratory relief even though it chooses not to issue an injunction or mandamus. A declaratory judgment can then be used as a predicate to further relief, including an injunction." *Powell v. McCormack*, 395 U.S. 486, 499 (1969) (citations omitted). Therefore, it is sufficient for our purposes here to merely note that "'the government, like everyone else, is bound by court orders in proceedings to which it is a party.'" *Fa`amausili*, 6 A.S.R.3d at 265 (quoting *Am. Samoa Gov't v. Satele*, 7 A.S.R.2d 154, 156 (Trial Div. 1988)). "We are confident that the [House] will abide by our ruling on the counts for declaratory relief." *Id.*

123

# III. DISCUSSION

## A. Powers at Issue

■ Several constitutional provisions are at the forefront of this case. The most prevalent is the section granting the House the power to "determine its rules of procedure, punish members for disorderly behavior and, with the consent of two-thirds of its entire membership, may expel a member, but not a second time for the same offense." AM. SAMOA REV. CONST. art. II, § 11. These are the "primary power[s] by which legislative bodies preserve their 'institutional integrity' without compromising the principle that citizens may choose their representatives." *Whitener v. NcWatters*, 112 F.2d 740, 744 (4th Cir. 1997). Commenting on the Federal counterpart, one scholar noted:

> No person can doubt the propriety of the provision authorizing each house to determine the rules of its own proceedings. If the power did not exist, it would be utterly impracticable to transact the business of the nation, either at all, or at least with decency, deliberation, and order. The humblest assembly of men is understood to possess this power; and it would be absurd to deprive the council of the nation of a like authority. *But the power to make rules would be nugatory, unless it was coupled with a power to punish for disorderly behavior, or disobedience to those rules.*

*Id.* (emphasis added) (quoting Joseph Story, *Commentaries on the Constitution of the United States* § 419).

■ We do not take lightly the structure of the Constitution in creating this purely legislative prerogative of disciplining its own members. Normally, the courts must refrain from prying into matters "that admit of legislative adjudication rather than judicial resolution." *Fa`amausili*, 6 A.S.R.3d at 264 (quoting *Tuitasi v. Lualemaga*, 4 A.S.R. 798, 810 (Trial Div. 1973)). We should not, for example, resolve disputes dealing solely with internal legislative rules, *see Brown v. Hansen*, 973 F.2d 1118, 1121-22 (3d Cir. 1992), or purely legislative functions, *see Dank*, 5 P.3d at 1092.

■ We have an obligation, however, to review governmental actions or laws that conflict with, or are limited by, constitutional provisions. *See Fa`amausili*, 6 A.S.R.3d at 260 ("We must fulfill our mandate as the arbiter of the law of the land"). Any legislative act, whether

124

intracameral[6] or not, must comply with the basic tenets of due process. *See id.* at 271-72; AM. SAMOA REV. CONST. art. I § 2. Though "due process is a fluid concept, [and] may have diverse applications in different situations [it encompasses the] basic principle of fair play." *Fa`amausili v. The Senate*, CA No. 88-02, slip op. at 6 n.3 (Trial Div. Jan. 31, 2003) (Order Denying Motion for Stay of Execution).

## B. Free Speech

 Muavaefa`atasi's first argument is that the House's actions violated his right of free speech as protected by AM. SAMOA REV. CONST. art. I, § 1 and U.S. CONST. amend. I. We disagree. Free speech is not absolute; it may, in certain, narrow situations be regulated. *See Konigsberg v. State Bar of Calif.*, 366 U.S. 36, 49-51 (1961). Legislative speech is no different. The Constitution provides that "[n]o member of the Legislature shall be held to answer before any tribunal *other than the Legislature itself* for any speech or debate in the Legislature." AM. SAMOA REV. CONST. art. II, § 12 (emphasis added). This provision, on the one hand, protects legislators from having to defend their decisions, arguments, or conduct--i.e, speech--outside of the Legislature (even against suits by other legislators). *See McGovern v. Martz*, 182 F. Supp. 343, 346 (D.D.C. 1950). On the other hand, this provision is "an assertion of the legislature's *exclusive* jurisdiction to punish speeches made in the course of legislative business." *Whitener*, 112 F.3d at 745 (emphasis in original). It reflects a conscious balance struck by the framers of the Territory's Constitution. Thus, whether to punish a sitting legislator for his legislative speech rests squarely with the Legislature and is immune from our review. *Contrast Bond v. Floyd*, 385 U.S. 116 (1966) (Congress cannot *exclude* a duly qualified member-elect from being seated on account of his political views).

Furthermore, assuming we could question the Legislature's decision, Muavaefa`atasi has not shown why his speech in this situation should be protected.

> [Muavaefa`atasi] was disciplined for his lack of decorum, not for expressing his view on policy. We cannot conclude that the [House] was without power to regulate uncivil behavior . . . . Indeed "[t]he greatest concern over speech within a deliberative body is that members might engage in personal invective or other offensive remarks that would unleash personal hostility and frustrate deliberative consideration."

---

[6] The term, meaning "occurring in and applicable to the internal operations of a legislative chamber," is taken from *Dank*, 5 P.3d at 1094 (Opala, J., concurring).

*Whitener*, 112 F.3d at 745 (quoting David S. Bogen, *The Origins of Freedom of Speech and Press*, 42 MD. L. REV. 429, 436 (1963)).

## C. Other Constitutional Restraints

■ We do not have the power to review whether it was proper for the House to punish Muavaefa'atasi for what he said; indeed, as noted, such power is specifically enshrined in the legislative branch. But whether to punish is not the same as how, and to what extent, the Legislature can punish. The Legislature cannot cloak itself in the punishment clause, art. II, § 11, and disregard other constitutional limitations. Accordingly, we will not turn a blind eye to the utter lack of fairness that has cast a shadow of doubt over Muavaefa'atasi's suspension and left his constituents without representation.

### i. Expulsion or Suspension

The House claims that it expressed restraint by suspending Muavaefa'atasi as opposed to expelling him. Nothing could be further from reality. Granted, by definition, Muavaefa'atasi is merely suspended, i.e., barred for a period of time, and not expelled, i.e., barred permanently. In this case, from Muavaefa'atasi's standpoint, this is a distinction without a difference: because of his complete ban on taking part in any legislative process or using any House resources, for all intents and purposes, he has been expelled. *See Dank*, 5 P.2d at 1096 (Opala, J., concurring) (arguing that prohibition on informed deliberation is akin to *pro tanto* expulsion).[7]

■ Expulsion for a very good reason requires a super-majority vote. AM. SAMOA REV. CONST. art. II, § 11 (two thirds vote). This procedure ensures a reflective and thoughtful decision by the entire legislative body and not just the triumph, on a whim, of a mere majority. Once again, commenting on the federal counterpart, one scholar noted:

---

[7] To hold otherwise would easily allow the House to slide down a slippery slope of impermissible conduct. What if, for example, the House imposed the suspension until the end-of the term? Or if they suspended a Representative for six months, but for the six months before his term expired? By calling it a suspension, the House would be allowed to expel a member without complying with the constitutional requirements of expulsion. Therefore, the House's own labels cannot be dispositive of the type of punishment they have handed down. Instead, we must look beyond semantics at the real effect of the punishment. In this case, even though Muavaefa'atasi is allowed to return, his suspension has had the same effects as an expulsion.

And as a member might be so lost to all sense of dignity and duty, as to disgrace the house by the grossness of his conduct, or interrupt its deliberations by perpetual violence or clamor, the power to expel for very aggravated misconduct was also indispensable, not as a common, but as an ultimate redress for the grievance. But such a power, so summary, and at the same time so subversive of the rights of the people, it was foreseen, might be exerted for mere purposes of faction or party, to remove a patriot, or to aid a corrupt measure; and it has therefore been wisely guarded by the restriction, that there shall be a concurrence of two thirds of the members, to justify an expulsion.

Joseph Story, *Commentaries on the Constitution of the United States*, Book III, ch. XII § 835 (emphasis added).[8]

 Therefore, a suspension of Muavaefa`atasi's magnitude, contradicts the purpose and constrictions of the expulsion clause. It allows a simple majority to effectuate an end-around assault on the super-majority requirement of art. II, § 11. *See supra* note 7.

 Expulsion provides another safeguard to democratic values: it allows for the vacant position to be filled by the affected constituents thereby extending continuous representation to the district of the barred representative. AM. SAMOA REV. CONST. art. II, § 13. Muavaefa`atasi has been completely prohibited from participating in the legislative process--he could introduce no bills and could not vote on any pending ones, he has been locked out of his office, and he has been banned from using any House resources. Had he been properly expelled, these consequences would have naturally befallen him. His constituents, however, would have been allowed to elect a new representative to fill the vacancy.

Perhaps the biggest losers in this controversy are the constituents of District No. 9, for they have now gone almost six months without a voice in the House of Representatives. *See Agaoleatu*, 7 A.S.R.3d at 66-67 (stating that the people of American Samoa "are the true beneficiaries of the Government's operations"); *Ammond v. McGahn*, 390 F. Supp. 655, 660 (D.N.J. 1975) ("The action by the [legislative body] in denying a Senator . . . the opportunity to attend its deliberations deprived her constituents of the Equal Protections of the law"); *Dank*, 5 P.3d at 1096 (Opala, J., concurring). In American Samoa, where only one legislative chamber is chosen by popular vote, representation in the House is the

---

[8] Justice Story's treatise may be found on-line at: http://www.utulsa.edu/law/classes/rice/Constitutional/Storey/story_hist_const_privilege.html.

singular method of securing a voice for the voters in the political process. Thus, Muavaefa`atasi's suspension is in a way more pernicious than a constitutional expulsion.

▮ We reiterate that the power to punish is the "primary power by which legislative bodies preserve their 'institutional integrity' *without compromising the principle that citizens may choose their representatives.*" *Whitener*, 112 F. 2d at 744 (emphasis added). The House's actions have compromised that principle. *See supra* note 7.

This is not to say, however, that a member could never be removed from the House for disorderly conduct. The legislative leadership needs the power to maintain order in its proceedings, just as a court needs authority to maintain order in its proceedings. But the power to remove a representative should only be exercised to the extent necessary to restore order in the House's proceedings. *See, e.g.*, House Rule II(2)(C) (if a member "persists in his disorderly conduct he shall not be permitted to take his seat during the remainder of the day's session except upon satisfactorily [sic] pledge given by him to the House for future good behavior"); *Whitener*, 112 F.3d at 741 (board member censured for one year and removed from standing committees); *Gewertz v. Jackman*, 467 F. Supp. 1047, 1054 (D.N.J. 1979) (Assemblyman removed from appropriations committee). Otherwise, the unbridled power to suspend can be always be used by a bare majority for purposes of affecting floor votes on any issue and thereby affect a legislative agenda, but such would be the antithesis of representative government.

ii. Due Process

▮ Not only did the House fail to comply with the two-thirds requirement for expulsion, it failed to comport with due process. It is evident that Muavaefa`atasi was not given notice of the four different times when the House, either in committee or in regular session, debated and voted on his conduct and punishment. And, in his absence, the House conducted these meetings without affording Muavaefa`atasi the opportunity to be heard: to address the other Representatives, to possibly call witnesses on his behalf, or to cross-examine those that testified against him. These minimal standards are the cornerstone of due process. *See Fa`amausili*, 6 A.S.R.3d at 272; *Ferstle v. Am. Samoa Gov't*, 7 A.S.R.2d 26, 49 (Trial Div. 1988); *Cf. Rideau v. Louisiana*, 373 U.S. 723, 726 (1963). "The opportunity to be heard is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Fa`amausili*, 6 A.S.R.3d at 272 (citing *Powell*, 395 U.S at 510 n.30); *Ferstle*, 7 A.S.R.2d at 49 (quoting *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976)).

We can only speculate as to what would have happened had Muavaefa`atasi been in attendance at any of these hearings. But given the serious nature of the punishment, the House had a duty to postpone debate until Muavaefa`atasi had notice or was present, even if his absence was unexcused. As the evidence clearly shows, Muavaefa`atasi was not afforded a meaningful opportunity to be heard and present a defense either going to the merits of the charge against him or in mitigation of punishment. His offending comment was in essence taken out of its context and placed before the House in a conclusory fashion. Had Muavaefa`atasi been afforded the opportunity to be heard, his testimony could have been especially beneficial to those members who were not present at the time of the incident complained of. For instance, it was quite clear from the record of the various proceedings that the severity of the punishment meted out was in part premised on the perception that Muavaefa`atasi's reference to ta'ifau was in fact a reference to all House members. But then Muavaefa`atasi was not allowed the opportunity to place before the House membership the distasteful innuendos his own interpretations of the language used by others at the time, such as Fetui's pregnant question to the Director of Parks and Recreation for evidence as to defecating people or dogs in the vicinity, coupled with representative Afalava's determined attempts to interrupt him on the floor.

Moreover, the disciplinary proceedings, as they unfolded, basically revealed that in Muavaefa`atasi's absence, the primary target of his verbal assault, Afalava, actively participated throughout these disciplinary proceedings not only in the roles of instigator and complainant, but that of being part of the prosecution team, being a part of the fact-finding body, and being a part of the judicial and sentencing body. It goes without saying that this sort of scenario is totally at odds with our notions of due process and basic fair play.

Finally, the House consistently violated its own internal rules including denying Muavaefa`atasi the right to speak when he was finally informed of his suspension. Standing alone, departure from internal rules is not a denial of due process. However, in this case, it evinces a calculated attempt to compromise Muavaefa`atasi's procedural due process rights by expediting the process with minimal dissent on the record.[9]

---

[9] The House relies on Mason's Manual of Legislative Procedure to fill in the blanks when their own published rules are wanting. Perhaps the Manual should have been consulted in this instance. Had the House done so, resort may have been had to Chapter 13, *Decorum in Debate*, which details how to handle an episode such as the one that took place and requires, *inter alia*, the right to address the body.

## IV. CONCLUSION

On the foregoing, we conclude and declare that Muavaefa`atasi's suspension from the House of Representatives of the Legislature of American Samoa as of February 10, 2003 is constitutionally invalid. Accordingly, we further declare that Muavaefa`atasi remains a sitting representative for House district No. 9, Maoputasi No. 3, entitled to all rights and privileges pertaining to his elected office, including but not limited to voting privileges, full pay and allowances accruing and unpaid after February 10, 2003.

It is so ordered.